No. 13,637.

STATE OF LOUISIANA vs. FRED. H. HAAB.

## SYLLABUS.

1. The extent to which a witness may be cross-examined is submitted to the discretion of the district judge, and this discretion will. not be interfered with unless it be abused. If the real object of a series of cross-questions as to the particulars of the past life of a witness, in a case of homicide, be not to affect his credibility, but incidentally to attack the character of the

deceased without the prerequired foundations then existing for so doing. or to simply prejudice the jury against the witness, the court is authorized to check such examination. Defendant is not entitled to cross-examine a witness upon collateral and irrelevant matters, in order through contradiction of the testimony which might be elicited therein, to impeach his credibility.

2. Defendant, charged with murder, is not entitled to enquire into the character of the deceased as being a man who was dangerous and violent, in the absence of evidence of an overt act on the latter's part which would excuse or mitigate defendant's act.

3. The court is authorized in the exercise of proper legal discretion to permit one of defendant's witnesses, who had been cross-examined by the State and then re-examined for the defense, to be re-cross-examined by the State.

4. Where the court refuses to sign a bill of exception presented to him, on the ground that no such bill was reserved, and a bill was reserved to such refusal, the statement of the court in the second bill that no bill was originally reserved will be taken as true.

5. The court is directly concerned in understanding the testimony given by the witnesses in a case, in order to guide its own actions and rulings, and therefore it has the right to question itself, the witnesses to have the scope of their testimony made clear, but the conduct of criminal cases should be left as much as possible in the hands of the State's officers specially entrusted with conducting them. Although it would have been better, in a particular case, that an incidental remark made by a court in the course of its questioning of a witness, should not have been made, no cause for reversal exists where it manifestly would not have influenced the jury.

6. A homicide committed during a drunken debauch is not rendered excusable by the fact that long-continued indulgence in drinking by the party committing the killing had created in him a desire to drink so strong that it was out of his power to resist.

7. Where a party in possession of his mind enters into a voluntary drunken debauch he is not legally excusable for a homicide which he commits during its continuance and while in a condition of drunkenness, even though this drunkenness may be such, at the time of the commission of the homicide, as to render his mind incapable of knowing right from wrong. If the debauch be one continuing voluntary drunken debauch, starting with the sanity of the party engaged in it, the mere length of time the debauch may extend over is immaterial. Drunkenness for a week no more excuses a homicide committed, as its immediate and direct result, than would drunkenness for an hour.

A PPEAL from the Criminal District Court, Parish of Orleans— *Moise, J.*

*Walter Guion,* Attorney General, and *J. Ward Gurley,* District Attorney, (*Lewis Guion* and *Joseph E. Generally,* of Counsel), for Plaintiff, Appellee.

*Chandler C. Luzenberg* for Defendant, Appellant.

The opinion of the court was delivered by

NICHOLLS, C. J. In this case, defendant, Fred. H. Haab, indicted for murder, convicted of manslaughter and sentenced to imprisonment for six years, at hard labor, in the penitentiary, has appealed from the sentence rendered, upon a number of grounds embodied in bills of exception and assignment of error, which we have examined with great care.

We think the testimony covered by the first six bills of exception, which the court refused defendant the right to introduce, was properly excluded. Courts have permitted counsel to go very far in their cross-examination of the State's witnesses when the purpose assigned is the attacking of their credibility, but the trial court is authorized to check this cross-examination when, in its judgment, it is about to exceed proper limits. We will not interfere with the exercise of that authority except in case of its abuse. We do not think that in this instance there was such an abuse. We think the court was justified in attributing the object of the questions propounded to the witnesses to be not so much the attacking of the credibility of the witnesses as the exciting of a prejudice against them on the part of the jury and the attacking of the character of the deceased prior to there existing any legal foundation warranting such an attack.

The matter sought to be examined into on cross-examination of a witness, for the purpose of attacking his credibility, should have a legitimate bearing upon that particular subject. Counsel should not be permitted to call upon him to expose particulars of his past life simply to attempt to bring him into reproach before the jury. The witnesses are entitled to proper protection from the court from unnecessary and improper specific investigation of their past history. It is claimed that the district attorney opened the door to this inquiry in one instance, at least, by seeking, by anticipation, to fortify the respectability of the witness by showing his past associations. Granting that to be true, the court permitted the defense to go quite as far as it was entitled to towards breaking the force of such testimony.

In connection with this particular subject it may be well to say that a person can not cross-examine a witness upon irrelevant, collateral matters for the purpose of attacking his credibility by disproving the testimony which he may give in respect to such matters on the cross-examination.

*Bill of exception No. 7* is to the refusal of the judge to sign bill of exception No. 7 when presented to him for that purpose. The court's statement that no such bill of exception, as bill No. 7, had been reserved must be taken as true as matters are presented. The court was justified in refusing to sign the bill under such circumstances.

*Bill Nos. 8 and 9* call in question the right of the court, and the exercise by the court, of the right to permit the State to re-cross-examine witnesses for the defense who had been examined by the defense, cross-examined by the State, and re-examined by the defense. The authority of the court to permit this re-cross-examination is unquestionable. We do not think the authority was improperly exercised.

*Bill No. 10* is to the question by the judge to examine in presence of the jury Dr. Maylie, a medical expert, witness for the defense, touching his testimony. It is claimed that through this questioning the judge communicated to the jury *his* impressions or opinions of the case. It is the right and the duty of the judge to keep advised of the testimony given in a case and to understand its scope so as to be able to deal with it in his charge to the jury, and on the application for a rehearing should a verdict be given against the prisoner. If he does not understand it fully he has the right to have it made explicit. It is well, however, for the trial judge to leave, generally, as far as possible, the conduct of criminal cases to the State officers entrusted with that duty; as the jury is very apt to form from the acts and questions of the judge an impression as to his views of the case.

We do not think the accused was prejudiced by the court's action, though there was one remark which might well have not been made.

*The 11th bill* is to the refusal of the court to permit a Mrs. Levi to testify to what is called a threat communicated by her to the accused. The testimony, though not given to the jury, was taken down by a stenographer and is annexed to the bill.

We do not find in it, when examined, the evidence of a threat of any kind whatever. Counsel of defendant was unable himself to state in what manner it would have affected his client's case, and the admissions made by him in the discussion which arose as to its admissibility withdraws from the testimony any value whatever. It was, in our opinion, irrelevant and unimportant testimony.

*The 12th bill* was to the refusal of the court to allow the Chief of Police, Gaster, to testify to the general reputation of the deceased as

being a dangerous and violent man. Under the judge's statement as to the testimony in the cause, no foundation had been laid for the introduction of this testimony and it was properly excluded.

The refusal of the judge to give the special charge referred to in bill of exception No. 14 was correct. As the charge asked for was worded, it was equivalent to saying that a homicide which would not be excusable because committed in a fit of voluntary drunkenness so complete as to render the person committing the homicide unable to distinguish at the time, between right and wrong, would become excusable if it could be shown that the fit of drunkenness was altogether attributable to an irresistible desire for drink due to long continued indulgence in intoxicating liquors. Bad habit, intensified by long continuance, does not work exemption from legal responsibility. The charge would raise confirmed drunkards into a specially favored class.

Counsel of the defendant has prefaced most of his bills of exception to the refusal of the judge to give to the jury special charges which he requested, and to the bills taken to the general charge of the judge with long statements as to what he avers to have been the evidence in the case, not as immediate predicates to the requested charges, but with the evident object and purpose of arguing to the court that such being the evidence in the case, the requested charges were properly asked and improperly refused, and the portion of the general charge objected to were properly objected to. The judge, in different addenda to the bills controverts some of these recitals entirely; others he modifies. There are so many of these special charges and recitals of evidence that it would extend this opinion beyond all reasonable length to give the same in detail. Collating and comparing them, we think that the evidence disclosed that, for some time previous to the homicide, at the time of the homicide, and up to the time of his arrest, the accused had been continually drinking heavily and getting drunk; that he was drunk at the time of the homicide. It is claimed for the defense that during this whole period the condition of his mind was such as to render him unable to distinguish right from wrong, and that his long continuance in excessive drinking had brought him into such a condition that he was unable to resist drinking and getting drunk; that his condition of mind was such as to give rise to delusions on his part that he was about to be attacked and killed.

It is claimed that during this long debauch he had delirium tremens

also at some time prior to the homicide; it is claimed that there was evidence to show that he was in fact crazy or insane at the time of the homicide, and that though this was the result of heavy drinking the accused was, nevertheless, excusable for the homicide.

Referring to one of the special charges requested by the accused, wherein reference is made to a person being first crazy and then getting drunk, and while "crazy drunk" committing homicide, the court said:

"No evidence supports this charge. The accused was never deranged before this particular spree, nor after. It was one continuous debauch beginning, according to his witnesses, about six weeks before the homicide, while the alleged insanity appeared about two weeks before the homicide. After the killing the accused recovered in a few days. Drunkenness pre-existed the alleged insanity." The judge further said that he had, in his general charge, announced the principles of law declared in that charge, though he did not think it applied to the defendant's case. He did charge that "if the intoxication was the result of pre-existing insanity and the accused, by reason of such pre-existing insanity could not overcome his desire to gratify his thirst for drink, then such insanity would be the actuating cause of the crime, and the jury should so consider it. If, however, his excessive indulgence in liquor was caused by his own negligence and he had an opportunity of correcting his weakness, and failed to do so, he is responsible for the results of his own excesses, accordingly, as you have been instructed in this charge, that is, if a temporary result, he would be responsible; if a permanent result, he would be irresponsible."

The district judge, at the foot of the bill of exceptions taken by the accused to his refusal to give to the jury the special charge that "the law recognizes the existence of a form of diseased mind known as *delirium tremens,* induced by the excessive use of stimulating drink, and in the event of a homicide committed by one laboring under such disease to a degree that dethrones reason and prevents him from knowing the difference between right and wrong, such homicide would be excusable, although such mental disease was not permanent and was due to the excessive drinking of alcoholic stimulants," made the following statement, evidently intended for the Supreme Court's consideration and not that of the jury:

"If Haab's condition at the time he fired the fatal shot could be properly designated as *delirium tremens* (which I deny), it must be shown to be—(1) a fixed, settled or permanent condition and not a temporary

one, as in this case. If a man voluntarily drinks to excess, temporarily destroying his mental soundness to such an extent as not to know the difference between right and wrong, and while in this condition commits an unlawful homicide, his act is inexcusable, whether you designate his mental condition as simple drunk, drunk to stupefaction, crazy drunk or insane, *dementia* or *delirium tremens*. The temporary character of his affection makes him responsible. A state of disease brought about by a person's own act, as *delirium tremens* caused by excessive drinking, is no excuse for committing a crime, unless the disease so produced is permanent. Withaus & Beeker, vol. 3, page 491; 1 Hale P. C. 32; 4 Black, 26; State vs. Kramer, 49 Ann. 774. This is the common law.

(2) It must also be shown that the *delirium tremens* was not the immediate product of excessive drinking, but a remote consequence of it. The facts are that Haab's mental condition may have been unsound at the time of the homicide, but was the immediate result of his undue indulgence in spirituous liquors and not the result of any previous sprees or drunkenness; that after the killing he was jailed and recovered in five or six days permanently. Under this state of facts the court declined to make any distinctions with reference to his unsound condition of mind. If he was merely 'crazy drunk,' as it is vulgarly called, he would be just as much entitled to an acquittal if he could not tell the difference between right and wrong as he would be if his condition was designated as a delirium.

"Criminal indulgence in the use of spirituous liquors would be the basis of both conditions."

Under other bills the court said:

"There was no evidence to show that delusion in this case was occasioned by a 'fixed' frenzy. There was nothing 'fixed' in defendant's mental condition. The evidence shows that his alleged mental derangement as a fact was temporary, and was created by the excessive use of spirituous liquors. The delusions, if any, were incidents to the excessive drinking. As to the statement that this accused was both drunk and insane: This phraseology may be misleading. It may imply there was evidence to show that the alleged insanity and drunkenness were two separate and distinct conditions proceeding from different causes. There was no evidence in support of such a fact. The evidence showed that Haab's symptoms, whatever they were, proceeded from one and the same cause and were its immediate and connecting effects, differing only in

State vs. Haab.

degree. Naturally, the continued use of spirituous liquors on one debauch without interruption, as in this case, would intensify each succeeding effect. A man who becomes 'crazy drunk' reaches this condition by stages."

Referring to one of the charges requested, but refused, the court said: "It failed to distinguish between a mental unsoundness, the immediate result of excessive drink, and one by long continued habit, a remote consequence of it. If one should become voluntarily drunk in the morning, indulging to such excess during the day as to lose all power of controlling the desire for drink and continuing his excesses at night, until drunk to madness, and in this condition should unlawfully slay another, such killing under the charge requested would be excusable."

In his reasons for refusing a new trial the judge said:

"The accused began drinking immoderately and was under the influence of liquor to a greater or less degree continually and without intermission for two weeks before the homicide, until its effects wore off, after his arrest and incarceration, when he ceased drinking. It makes no difference by what terms you designate the temporary effects of his excesses, whether called an ordinary drunk, drunk to stupefaction, *delirium tremens,* drunk to frenzy, insanity, etc., if it were the immediate product of this particular debauch he is responsible for his acts under its influence. There was no evidence whatever that Haab's condition was a remote consequence of long continued prior excesses, nor that he had ever been in this condition before. In the opinion of the court, at the time of the firing of the fatal shot Haab was not suffering from *delirium tremens;* he was merely afflicted with that nervousness that always accompanies immoderate indulgence in liquor."

We have referred to United States vs. Drew, cited by counsel, and reported in 5 Mason's Reports, page 29, C. C. R. The accused upon an admitted state of facts was declared insane and discharged. In the course of his opinion in the case, Judge Story used the following language:

"In general, insanity is an excuse for the commission of every crime, because the party has not the possession of that reason which includes responsibility. An exception is when the crime is committed by a party while in a state of intoxication, the law not permitting a man to avail himself of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. But the crime must take and be the *immediate* result of a fit of intoxication and *while it lasts* and not as in

this case a remote consequence superinduced by the antecedent exhaustion of the party arising from gross and habitual drunkenness. However criminal, in a moral point of view, such an indulgence is, and however justly a party may be responsible for his acts arising from it to Almighty God, human tribunals are generally restricted from punishing them, since they are not the acts of a reasonable being. Had the crime been committed while defendant was in a fit of intoxication he would have been liable to be convicted of murder. As he was *not then intoxicated,* but merely *insane* from an *abstinence from liquor* he cannot be pronounced guilty of the offense. The law looks to the *immediate* and not to the *remote* cause—to the actual state of the party and not to the causes which remotely caused it.

"Many species of insanity arise remotely from what, in a moral view, is a criminal negligence or fault of the party, as from religious melancholy, undue exposure, extravagant pride, ambition, etc. Yet such immunity has always been deemed a sufficient excuse for any crime done under its influence."

We think it fairly appears from the recitals of the accused and those of the judge that the accused was in a state of intoxication at the time of the homicide, and that his mental condition at that time, whatever it might be, was the immediate and direct result and not the remote result of voluntary drunkenness. When we say direct and immediate result, we mean to say that it arose during a condition of drunkenness and pending a single, continuing, voluntary drunken debauch which, at its origin, started with the accused in a condition of sanity. The results were in a legal sense immediate and direct results, though the beginning of the drunken debauch may have dated some days back, or even some weeks before the homicide.

We think, under the recitals in the case, that it is precisely such a one as Mr. Justice Story refers to in which he says, "insanity or a condition of mind substantially that of insanity, would not serve as a shelter or a protection against crime."

We think that this was the view taken by the district judge of the facts and law of the case, a view which he endeavored to place before the jury in his charge. We think he fairly advised the jury as to the law, though there were some expressions in his charge which he might well have omitted, as they doubtless did not instruct and may perhaps have to some extent confused the jury. We do not think, however, they were led into error or misled by these expressions, or that they were

prejudicial. It is well for a judge charging a jury as to insanity to avoid as far as possible the use of technical medical terms as to the various forms and shades of mental disease. ;

They are not likely to enlighten or impress the jury; and are very liable to technical objections.

We do not think there is any ground for the reversal of the judgment, and it is hereby affirmed.

Rehearing refused.