WEAKLEY *v.* STATE.

Opinion delivered June 8, 1925.

1. HOMICIDE—INSTRUCTIONS—MANSLAUGHTER.—Where the State's evidence was that defendant shot and killed deceased while in a state of voluntary intoxication and without provocation, and the testimony of defendant tended to prove that defendant did not know what he was doing at the time of the shooting, *held* that there was no room for an instruction on manslaughter.

2. HOMICIDE—MALICE—KILLING WHILE DRUNK.—As the specific intent to kill is unnecessary in murder in the second degree under our statute, if one voluntarily becomes too drunk to know what he is about, and then without provocation by the use of a deadly weapon shoots and kills another, he commits murder in the same degree as if he were sober.

3. HOMICIDE—DISEASED MIND—INSTRUCTION.—Where, in a prosecution for murder in the second degree, the testimony of the defendant's witnesses was to the effect that drinking so affected his mind that he did not know what he was doing during the period of his intoxication and for several days thereafter, but there was no testimony tending to show that he was afflicted with delirium tremens or any form of mental disease, and that the killing was the result of such disease, it was not error to refuse to instruct the jury to find defendant not guilty if at the time of the killing he was laboring under such a defect of reason as not to know the nature of the act he was doing or was ignorant that he was doing what was wrong.

4. WITNESS—CROSS-EXAMINATION.—Where, on direct examination, defendant asked his witness as to defendant's reputation for peace and quietude, it was not error on cross-examination to permit the State to ask the witness whether there had been any complaint about dances, drinking parties and crap games at defendant's

house, and whether defendant's reputation for morality was good or bad.

5. HOMICIDE—DYING DECLARATIONS.—A statement made by deceased after he was shot was inadmissible, in the absence of proof that the statement was made under a sense of impending death.

Appeal from Arkansas Circuit Court, Southern District; *George W. Clark,* Judge; affirmed.

*Botts & O'Daniels,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. The appellant was indicted by the grand jury of Arkansas County for the crime of murder in the second degree in the killing of one Den Garrison.

Witness Slim Huddleston for the State testified substantially as follows:

On the night of the shooting Den Garrison and others were at the appellant's house. They had met there for a dance. After the dance broke up some of them went upstairs and engaged in a crap game. Garrison borrowed some money from the defendant that night. The game broke up about four o'clock in the morning, and the crowd went down stairs. The defendant came down stairs and through the room where Garrison and others were, but did not at that time say anything. He went into the kitchen and came back with a gun and cursed and said, "Now, what do you want me to do?" He threw the gun on his wife who ran and picked up the baby and said, "Daddy, don't shoot me, I have got the baby." Albert Dallas and witness were the only men in the room at that time. Witness left the room and went about a hundred yards from the house and about that time a shot was fired. Witness went back to the house and found Den Garrison was shot. The defendant told them all to clear out, and some one took the gun away from him. Garrison was lying on the floor with a wound about an inch or two across on the inside of his leg. Garrison asked the defendant why he shot him, and the defendant smiled a little bit and told Garrison that he had insulted his wife, but when

his wife came in she said that Garrison had not insulted her. Garrison and defendant were friendly.

Witness Albert Dallas testified that he was at the dance at defendant's home when the defendant came down stairs and got his gun and told the crowd to leave. Witness left and went down the road about a quarter of a mile when he heard a gun fire. Witness didn't hear the defendant say anything to Garrison that night. They had no differences or words over money. Witness didn't see or hear anything to indicate that the defendant and Garrison were on unfriendly terms. Witness didn't hear the defendant cursing or going on— no more than he told the parties to leave. Defendant didn't point the gun at anybody. He did not make any complaint against any particular person. He came in swinging the gun around and told witness and the others to leave.

Lester Miller testified that he was at defendant's home the night of the shooting. The defendant had been upstairs asleep and came down with a gun. He pointed the gun in at the door and ordered the crowd to leave. There were eight or ten in the room at that time. Garrison went out of the house and came in at the front and told the defendant, "For Christ's sake, put that gun up before you shoot some one!" Defendant said something that witness did not understand, and Garrison turned about that time, and defendant shot, and Garrison fell up against witness. Witness asked him where he was hit, and Garrison replied, "He hit me in the leg." About that time the light went out and witness ran. He returned in about five or ten minutes and some one had taken the gun away from defendant. Witness stated that defendant was in the game and had been winning a little and had loaned Den Garrison some money during the game.

Other testimony for the State was to the effect that Garrison was shot on Saturday night and lingered until the Wednesday following and died about six o'clock from the effects of the wound. One witness testified

that he saw Den Garrison on Saturday prior to the shoot-
ing; that witness and Garrison hauled rice together to
DeWitt. When witness next saw Garrison, he was
lying on a bed at defendant's house complaining of
being shot. Witness saw a hole in his leg which was
a fresh wound, and he stayed with Garrison from that
time on until the following Wednesday about eleven
o'clock. Garrison gradually grew worse from the time
witness first saw him after he was shot until he died.

The defendant offered testimony by several wit-
nesses to the effect that, after the shooting and after
Garrison had been removed to a neighbor's house, he
made a statement which was written down by a party
in the presence of the justice of the peace in which Garri-
son stated that the shooting was accidental; that Weakley
was a good friend of his, and that he should not be pun-
ished for the shooting, and that he did not want Weakley
punished for it.

One of these witnesses, L. L. Brown, a justice of
the peace, testified that he had known the defendant for
many years; that he had never known him to be in any
trouble except drinking; that his reputation for peace
and quietude in the community in which he lived was
good, and that he lived within one block of the defendant
for about fourteen years. On cross examination of this
witness the following occurred:

"Q. What is the general reputation of the defend-
ant for morality? MR. BOTTS: We object to that. A.
Good as far as I know. Q. Did you ever have any com-
plaint, Squire, of him having these dances and drinking
parties and crap games out there at his place? MR.
BOTTS: We object to that. COURT: You have his repu-
tation in issue? MR. BOTTS: I did not put his reputa-
tion in issue for specific acts. COURT: You have it in
issue. MR. BOTTS: That is not competent testimony.
COURT: I have passed on it. [Exception saved by defend-
ant.] A. I heard them talking about this game up
there. Q. You have had complaint about having these
dances and drinking parties out there for young boys?

MR. BOTTS: We object to that. COURT: Objection over-ruled. [Exception saved.]  Q.  Basing your opinion on that, tell the jury whether or not you consider his repu-tation for morality, good or bad?  A.  From what I have heard from the general discussion it is not so very good. Q.  You would not consider a man's reputation good if he would permit young boys to come there and gamble all night?  COURT:  That is common knowledge.  MR. BOTTS: Defendant objects to these questions and remarks of the court.''  Objection overruled and exceptions saved.

There was testimony to the effect that the appellant was a hard drinker; that during the time he was drink-ing and for several days thereafter he did not seem to know what he was doing.  He was unable to work, easily excited and highly nervous.  One witness testi-fied that he saw the defendant a short time after the shooting, and he appeared as though he had been on a drunk; that for two or three days after the defendant had been drinking he would not act in his right mind— did not seem to know what he was doing and did not talk naturally; that he acted the same way on this occa-sion.  Another witness testified that he was in the army with the defendant during the world war; that when defendant had been drinking for two or three days he did not know what had taken place and did not realize what he had done or what had been done to him; that on these occasions he would disobey the officers and did not seem to realize anything about what was taking place.

The defendant's brother, after testifying as above, stated that in his opinion the excessive drinking of poisonous alcohol by the appellant had diseased his mind to the extent that when he took a few drinks of whiskey he was temporarily insane and did not know what he was doing; that this condition of mind was growing worse from year to year.

The defendant himself testified that the only thing he knew about the shooting was what they told him about it.  He had no ill feeling toward the deceased.  On the contrary, they had always been the best of friends. When

they told him about the shooting, he would not believe it, and, when they took him in to where Garrison was, the latter said there was no cause in the world for the defendant to shoot him, and that it was an accident. He had never had a quarrel with Garrison. About six years before he (defendant) had got to drinking. He could not resist the temptation. It affected his mind. He quit for about two years and later got to drinking again, and his mind was more greatly affected than before. During the time he was drinking he was not at himself. He was nervous, and if some one spoke to him it would frighten him until he did not know what he was doing. On cross examination he stated that he had had four dances at his house; that he had been drinking during the dance, and did not know where he got the gun or whether it was loaded or not. He didn't want the boys to shoot craps and told them so. He told Garrison and others that they could have the dance if they did not bring any whiskey.

The court instructed the jury defining murder in the second degree and told them in effect that, in order to convict the defendant, the evidence upon the part of the State must show that the killing was unlawful, that it was unnecessary, not justifiable or excusable, that it was willful, that is, intentional, and was done with malice; that malice denoted the state of mind and the act that prompts the motive of the defendant; that it was an act done wickedly and without due regard for the rights of one's fellow man—an act done cruelly; that, if the shooting was unlawful and done with a deadly or dangerous weapon in the use of such deadly or dangerous weapon, the law implies malice, and the State was not required to prove it; that it was necessary for the State to prove that the deceased died in a year and a day from the time of the infliction of the injury and the shot was the cause of his death, and that it occurred in Arkansas County within five years before the finding of the indictment. The court then instructed the jury as to the form of the verdict in case they should find defendant

guilty of murder in the second degree, and the punishment for such crime.

The court further instructed the jury that it was the contention of the appellant that if he shot Garrison he was under the influence of intoxicating liquor to such an extent as to render him incapable of knowing right from wrong; that, where the charge was murder in the second degree, it is unnecessary to prove a specific intent to kill; that if one voluntarily becomes too drunk to know what he is about and without provocation assaults and beats another person, and such assault causes the death of the other person, he would be guilty of murder in the second degree.

The court gave correct instructions on the credibility of witnesses and reasonable doubt. The court further announced the law to be that, if the killing is unlawful and a deadly or dangerous weapon is used, the inference of malice could not be rebutted; that, if the killing was not an unlawful killing, it would be a justifiable or excusable killing, and the defendant would be relieved.

The appellant asked the court to instruct the jury "that voluntary intoxication is no defense to this charge, but that if you believe from a preponderance of the evidence that at the time of the alleged shooting the defendant was laboring under such a defect of reason from disease of the mind, regardless of the cause of such mental condition, as not to know the nature of the act he was doing, or, if he did know it, that he was ignorant that he was doing what was wrong, then you will find the defendant not guilty."

The appellant also asked the court to instruct the jury on the lower degrees of homicide, which prayers the court refused.

The jury returned a verdict of guilty of murder in the second degree and fixed the punishment at five years in the State penitentiary. From the judgment pronouncing sentence in accordance with the verdict, the appellant prosecutes this appeal.

1. The jury might have found from the testimony of the witnesses for the State, which it was their sole province to accept or reject, that the appellant shot and killed Garrison while appellant was in a state of voluntary intoxication, and that there was no provocation whatever on the part of Garrison. The testimony on behalf of the appellant tended to prove that the appellant did not know what he was doing at the time of the shooting, and did not know that he had shot Garrison. Such being the state of the record, the court did nor err in holding that there was no testimony to justify the giving of instructions on any lower degree of homicide than that of murder in the second degree. There was no room for an instruction on manslaughter under the undisputed evidence both for the State and the appellant. *Kinslow* v. *State,* 85 Ark. 515; *Bradshaw* v. *State,* 95 Ark. 409.

Mr. Bishop says: "A man may be guilty of murder without intending to take life, or of manslaughter without so intending, or he may purposely take life without committing any crime. The intention to drink may fully supply the place of malice aforethought so that, if one voluntarily becomes too drunk to know what he is about and then with a deadly weapon kills another, he does murder the same as if he were sober. In other words, the mere fact of drunkenness will not reduce to manslaughter a homicide which would otherwise be murder." Bishop's New Criminal Law, p. 296, § 401. This is the doctrine applied by us in *Byrd* v. *State,* 76 Ark. 286, 289, where we said: "But no specific intent to kill is necessary to constitute the crime of murder in the second degree under our statute, and the law is that the intention to drink may fully supply the place of malice aforethought, so that if one voluntarily becomes too drunk to know what he is about and then without provocation assaults and beats another to death, he does murder the same as if he was sober."

While the instructions of the court were long and involved, yet there is no erroneous declaration of law

announced in any of them, and they were not calculated to confuse and mislead the jury. The charge of the court on the issue as to whether or not the killing was done with malice or whether it was the result of *mania a potu* — insanity produced by intoxication — was in accordance with the doctrine announced by this court in *Byrd* v. *State, supra.* See also *Casat* v. *State,* 40 Ark. 511. If the killing was the result of voluntary intoxication without provocation and by the use of a deadly weapon, then it was murder in the second degree, unless the appellant at the time was laboring under such a diseased condition of the mind, a fixed insanity caused by continued intoxication, that he was incapable of knowing the nature of the act he was doing, or, if he did know the nature of the act, that he did not know it was wrong.

While the testimony of the defendant and of several witnesses was to the effect that drinking so affected the appellant's mind that he did not know what he was doing during the period of his intoxication and for several days thereafter, yet there was no testimony in the record tending to show that appellant was afflicted with delirium tremens or any other form of mental disease produced by intoxication, and that the killing was the result of such disease rather than the result of a mere temporary loss of reason caused by voluntary intoxication. The court, therefore, did not err in refusing appellant's prayer for instruction No. 2. The doctrine of *Martin* v. *State,* 100 Ark. 189, upon which appellant relies to sustain this instruction has no application to the facts of this record.

2. One of the appellant's assignments of error is that the court erred in permitting the State to prove by witness L. L. Brown that he heard some complaint or rumor against the dances that defendant had permitted to take place at his house and also erred in permitting the witness to be asked about specific acts of misconduct on the part of the appellant. Brown, witness for appellant, testified on direct examination that he had

known appellant many years; had never known him to be in any trouble except drinking; that his reputation for peace and quietude in the community where he lived was good. The court, on cross examination, permitted the State to ask the witness if he had heard any complaint about the appellant having dances and drinking parties and crap games at his house for young boys. There was no error in the ruling of the court. In the first place, the appellant by the question asked the witness on direct examination put in issue appellant's general reputation for peace and quietude in the community in which he lived.

Now, peace and quietude in the legal sense — the sense contemplated by the question — signifies "public quiet, order and security; public tranquillity and obedience to law. Hence, that public order and security which is commanded by the laws of a particular sovereign, lord or superior. * * * Hence, analogously, of the peace established by any laws." Webster's Dictionary. Public peace is "a condition of order that conforms to the requirements of the laws." Funk & Wagnalls' Dict. The witness Brown was justice of the peace, and one of the questions asked him on cross examination was if there had ever been any complaint of the dances, drinking parties and crap games had at appellant's home, and in answer to this question he stated that he had heard them talking about this game up there. He was further asked if there hadn't been complaint about the dances and drinking parties for young boys, and if he hadn't heard of the general discussion of appellant's past record, and from that discussion whether he considered appellant's reputation for morality good or bad. He answered that from the general discussion it was not so very good.

These questions were legitimate on cross examination to show that the reputation of appellant in the community where he lived was not very good for peace and quietude. The questions on cross examination were responsive to the issue raised by appellant by the partic-

ular form of the questions asked the witness on direct examination concerning appellant's reputation for peace and quietude. In the second place, the questions propounded the witness on cross examination were proper in order to test the accuracy of the statements of the witness on his direct examination and his credibility.

In *St. L. I. M. & S. Ry. Co.* v. *Stroud,* 67 Ark. 112, we said: ''There could be no doubt that when a witness is put on the stand to attack or defend character he can only be asked on the examination in chief as to the general character of the person whose character is in question, and he will not be permitted to testify to particular facts either favorable or unfavorable to such person; but when the witness is subjected to cross examination, he may then be asked, with a view to test the value of his testimony, as to particular facts.'' *Clark* v. *State,* 135 Ark. 570-73; *Carr* v. *State,* 147 Ark. 524.

3. The court did not err in refusing to allow appellant to prove the alleged dying declaration of Garrison. The proper foundation was not laid for the admission of such testimony.

4. There are several other assignments of error urged for reversal of the judgment in the brief of appellant's counsel but it would unduly extend this opinion to discuss them. Suffice it to say, we have examined them and find no prejudicial error in the rulings of the court.

The judgment is therefore affirmed.