## Perciful v. Commonwealth.

(Decided December 2, 1925.)

## Appeal from Rockcastle Circuit Court.

1. Criminal Law—Summoning of Sheriff and Deputy to Testify Against Accused Not Sufficient Showing of Personal Prejudice to Authorize Appointment of Special Bailiff to Summon and Take Charge of Jury.—In murder prosecution, held, that court's overruling of accused's motion to have special bailiff summoned to take charge of jury was not erroneous, where no other fact of personal prejudice or hostility of deputy or sheriff towards accused was shown by affidavit other than fact they were witnesses in case against him.

2. Homicide—Proof of Insanity Will Not Authorize Manslaughter Charge.—In murder prosecution, proof of insanity will not authorize giving of manslaughter charge; insanity being complete defense.

3. Criminal Law—Homicide—Drunkenness May be Introduced as Res Gestae, but Not to Rebut Malice or Reduce Crime to Manslaughter, and Will Not Support an Instruction on Manslaughter—"Manslaughter."—In a murder prosecution, drunkenness of accused may be admitted as part of res gestae to assist jury in assessing punishment for murder, but not to rebut malice or reduce crime to manslaughter, and will not support an instruction on manslaughter; "manslaughter" being defined to be the unlawful, willful, and felonious killing of another in sudden heat of passion or in sudden affray, without previous malice, and not in the necessary, or apparently necessary, self-defense of slayer.

4. Homicide—Manslaughter Instruction Unauthorized by Evidence of Accused's Drunkenness, where no Sudden Affray or Other Facts Arousing Accused's Passion Shown.—In a murder prosecution, evidence introduced by defendant as to his drunkenness at time of killing did not warrant an instruction on manslaughter, where it was not shown that there was a sudden affray, or that deceased did anything arousing accused's passion, but, on the contrary, it was clearly shown that accused lay in wait for his victim, and shot him without provocation or excuse.

5.  Homicide—Instruction Jury should Not Acquit on Ground of His
    Insanity, if Mental Condition of Accused Arose From Volun-
    tary Drunkenness, Proper, and Not Dependent Upon Volun-
    tary Manslaughter Charge.—In a murder prosecution, charge
    by court that, if jury believed accused had not sufficient reason
    to know right from wrong, or lacked sufficient power to govern
    his action by reason of some impulse, yet they should not acquit
    if they found that such mental condition arose from voluntary
    drunkenness and not from unsoundness of mind, held proper, and
    not dependent upon whether instruction on voluntary manslaugh-
    ter was given.

S. D. LEWIS and DENTON & PERKINS for appellant.

B. J. BETHURUM, C. C. WILLIAMS, G. M. BALLARD, W. N.
FLIPPIN, FRANK E. DAUGHERTY, Attorney General, and CHAS.
F. CREAL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Appellant was convicted of murder and his punish-
ment fixed at death.

Appellant was employed as a section hand on the
Louisville & Nashville Railroad, which passes through
the town of Mt. Vernon. He lived in the northeast section
of Mt. Vernon and his home was about half a mile from
the center of the town. The deceased, J. W. Rider, was
engaged in the flour and feed business and was also the
proprietor of the Rockcastle Hotel. Shortly after dark
on the evening of the homicide appellant, according to
the evidence for the Commonwealth, approached the
hotel entrance with a large Luger pistol in his hand.
Meeting V. C. Tate, cashier of the bank of Mt. Vernon,
and a regular boarder at the hotel, he used some insult-
ing language and then fired several shots into the floor
of the front approach to the hotel office and at the feet
of Tate. The town marshal having been informed of the
trouble appeared on the scene, and, with the assistance
of appellant's brother, disarmed appellant. About the
same time D. G. Clark, the sheriff of the county, heard
of the difficulty and attempted to arrest appellant. Appel-
lant declined to submit to the arrest on the ground that
he had not committed any offense in the presence of the
sheriff and that no warrant had been procured for his
arrest. After some discussion he agreed to surrender
and go to jail provided the sheriff would first allow him
to go to his home. To this the sheriff assented and they
started in the direction of appellant's home. While on

the way, and during the discussion between appellant and the sheriff, Rider approached them and addressing appellant said, "Will, I would go back if I were you." Appellant responded, "God damn you, you go back." Rider then left. As appellant and Clark proceeded towards appellant's home appellant said, "God damn Bill Rider and Vic Tate; I will see them again," and made some remark about his Luger. After reaching his home appellant again refused to go with the sheriff without a warrant. The sheriff then went to the home of the county judge to get a warrant. During his absence appellant procured a shot gun and went down town. He took a position in a dark, secluded spot at the rear corner of his brother's garage, which is on the back end of the lot on which the hotel is located. The hotel entrance is only about 25 yards away and was in plain view from where he stood. He remained there for several minutes and was looking in the direction of the entrance to the hotel. While there Lon Hansel appeared and he told Hansel "to get in the clear." Shortly after Rider came out of the hotel in company with his wife and others and started around the hotel. Appellant then went to the mouth of a covered alley where it was probable that Rider would pass and took a position by a concrete pillar. Other persons passed, but he did not molest them. As Rider passed, appellant drew his gun and fired, striking Rider in the back and killing him instantly. After firing the shot he broke his gun and took another shell out of his pocket. He then ran down the alley in the direction of his home. When near his home he was still running pretty fast. The officers were immediately notified of the homicide and went at once to appellant's home. They found him in bed and his gun was still warm and smelled of powder. He claimed that he had been asleep and had not left his home, and denied having killed Rider.

On the other hand, appellant's testimony was as follows: When nine or ten years of age he fell over a cliff, broke a collar bone, received an injury to his head, and was in bed for two or three weeks. When the World War broke out he enlisted and went to France. He fought at two or three different places and was actively engaged in the battle of St. Mihiel. They were six days in going to the front and the battle lasted four days. During that time he never slept at all. Several of his friends and companions were killed and many shells dropped about him. While cleaning his gun he received an injury to his hand.

He also received fumes from gases which blistered him all over and filled his head and lungs. After being wounded in his hand he was carried to the hospital on September 14th and remained there until the fifth day of March. He was afterwards discharged at Camp Taylor and returned to his brother's home. After a week or two he went to work in the mines. He was short winded, always smelled battle smoke, and got dizzy. He also suffered from abscesses in his head. After he got home a man struck him in the head with a gun, and he was rendered unconscious. After that time he was dizzy, took nervous spells and had headaches for three or four days at a time. After receiving the lick on the head he did not work any more for a year. At one time some slate fell on his head and back from a place about seven feet high and he suffered from that wound for several days. He knew Rider and had business relations with him. On the day of the homicide he worked until about three o'clock. He then went to Rider's place and bought a sack of feed and started home. While he was home he drank somewhere between a quart and a half gallon of fermented grape wine. While there he dressed for the purpose of going to some kind of a meeting. When he came down town he drank some moonshine. After that he went to John Baker's place where he drank two glasses of whiskey. After drinking that liquor he must have been pretty drunk. He had an automatic pistol at the time. He thought that he had fired his pistol that night. It was up around the Rockcastle Hotel. He did not shoot because he had anything against anybody. After that he believed that he fired two shots. He remembered his brother taking his pistol from him. There was somebody else there. Nobody advised him to go home, and he did not remember what was said. He then started for home and on his way he met Dave Clark. Clark wanted him to go back to town and he agreed to go. After he had the interview with Clark he did not know where he went. That was all he remembered. The next thing he remembered he woke up in jail the following morning. He was then sick and his head hurt. If he went in the driveway and shot Rider, he did not remember.

In addition to this, the members of his family and others gave it as their opinion that appellant was of unsound mind because he would not answer questions promptly, or would get mad at nothing, or quarrel a great deal and was always fussing at somebody, or that

he was easily irritated and hard to get along with. Not only so, but Dr. Sprague, a distinguished alienist, in answer to a hypothetical question, gave it as his opinion that appellant was insane.

In rebuttal the Commonwealth introduced Drs. W. E. Gardner and W. A. Jilson, who, in answer to the same hypothetical question propounded to Dr. Sprague, gave it as their opinion that appellant was not insane. They also introduced other physicians who had observed appellant's conduct and testified that he was a sane man at the time of the killing. There was further evidence by appellant's fellow employees and neighbors that they never observed anything wrong with his mind. Dr. Moore testified that when he saw appellant going home he was sober, and John Baker, who, appellant claims, gave him two glasses of whiskey, denied that appellant drank anything at his place of business.

The first ground on which a reversal is asked is that the court erred in overruling appellant's motion to appoint an elisor or special bailiff to summon and take charge of the jury during the trial. The motion was supported by appellant's affidavit to the effect that the sheriff, D. G. Clark, and his deputy, J. W. Mink, were unduly prejudiced against him; that they were witnesses against him in the prosecution and had been very active in working up the case and procuring other witnesses; that shortly after his arrest Sheriff Clark and his deputy, Mink, took appellant to the Louisville jail and that while there he and his deputy, in company with a private detective of the city of Louisville, took appellant in a private office on two different occasions and put him through a severe and rigid examination relative to the prosecution; that Sheriff Clark asked the most of the questions and attempted to force him to tell all about the shooting and his connection with it; that the sheriff talked to newspaper reporters and took great interest in telling of the details connected with the killing; that because of the prejudice against him by the sheriff and his deputy, and the interest they had taken in the case, and because of the fact that Clark was a witness in the case, they would not summon a fair and impartial jury to try the case. The sheriff and his deputy filed counter affidavits denying all the allegations in appellant's affidavit. They admitted that they were witnesses in the case, but denied that they were material witnesses as they were not present at the time of the shooting and killing. They

denied in particular the charge that they were prejudiced against appellant and alleged that they would use their best efforts to summon a fair and impartial jury. It will be observed that while the affidavit alleges that the sheriff and his deputy were prejudiced against him the affidavit states no fact showing prejudice other than the claim that they were witnesses against appellant. To justify the court in appointing someone else to summon and take charge of the jury in place of the sheriff or his deputy facts should be alleged which clearly show that the sheriff and his deputy are personally prejudiced against, or hostile to, the accused, and the mere fact that they have been, or may be, summoned to testify against the accused is not a sufficient showing of personal hostility or bias to authorize the court to strip them of their duties under the statute and impose their performance on someone else. It follows that the court did not err in overruling appellant's motion.

It is next insisted that the court erred in refusing to give a manslaughter instruction. As insanity excuses altogether, it is at once apparent that proof of insanity other than drunkenness would not authorize a manslaughter instruction. Therefore, the question turns on whether proof that appellant was drunk and did not know what he was doing required the giving of such an instruction. We have recently had occasion to consider the question and what was said need not be repeated at length. It is sufficient to say that evidence that the accused, who acted with premeditation and killed the object of his hatred, was drunk is admitted as part of the *res gestae* and to assist the jury in assessing punishment for murder, but not to rebut malice and reduce the crime to manslaughter, and will not support an instruction on manslaughter. Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509. In its ordinary acceptation, manslaughter is the unlawful, willful and felonious killing of another in sudden heat of passion or in sudden affray, and without previous malice, and not in the necessary or apparently necessary self-defense of the slayer. Commonwealth v. Mosser, 133 Ky. 609, 118 S. W. 915. Of course, where there is other and independent evidence tending to show that the killing was done in sudden heat of passion or in sudden affray and without previous malice, the mere fact that the accused was drunk will not deprive him of a manslaughter instruction; but when

there is no evidence that the crime was committed in sudden heat of passion or in sudden affray and without previous malice his drunkenness will not have the effect of reducing the crime from murder to manslaughter. It is true that there was no evidence of any hostility on the part of appellant towards the deceased prior to the day of the homicide. It does appear, however, that when appellant was in a bad frame of mind because of his attempted arrest he took offense at deceased, who suggested that he go with the officer and said, "God damn you, you go back." Later on he said, "God damn Bill Rider and Vic Tate; I'll see them again." Not only so, but after reaching his home and while the sheriff was gone to get a warrant of arrest he took his shot gun and repaired to a secluded spot in full view of the hotel entrance. While there other persons passed by, but he did not attempt to hurt them. When Rider appeared with others he let him go by. He then went to another place where it was probable Rider would pass. While standing there Rider came by unattended and appellant shot him in the back. There was no sudden affray and Rider did nothing to arouse his passion. The case is simply one where he lay in wait for his victim and shot him without provocation or excuse. In view of these circumstances he was not entitled to an instruction on manslaughter.

After giving the usual instruction on insanity the court gave the following instruction:

"The court further instructs the jury that although they may believe from the evidence that the defendent at the time of the killing of J. W. Rider, if he did do so, had not sufficient reason to know right from wrong, or was without sufficient power to govern his actions by reason of some impulse, which he could not resist or control, yet if they further believe from the evidence that such lack of reason to know right from wrong, or such insufficient will power to govern his actions, or to control his impulses, arose alone from voluntary drunkenness, then existing and not from an unsoundness of mind, the jury should not acquit the defendant upon the grounds of insanity."

It is conceded that this instruction has been approved in other cases, Wright v. Commonwealth, 72 S. W. 340, 24 Ky. Law Rep. 1838; Mathley v. Commonwealth, 120

Ky. 389, 86 S. W. 988, but insisted that in each of them an instruction on voluntary manslaughter was given. That may be true because of other and independent evidence tending to make out a case of manslaughter, but the fact that a manslaughter instruction was given was not stressed by the court, and the propriety of an instruction like the one above can not be made to turn on whether an instruction on voluntary manslaughter was given. The instruction simply gives effect to the salutary rule that temporary insanity caused solely by voluntary drunkenness at the time of the homicide does not exempt one from responsibility for his act. It does not purport to deal with settled insanity produced by long continued intoxication prior to the homicide. Under the facts of this case the instruction was peculiarly applicable and proper.

There are verbal criticisms of other instructions, but they are not of sufficient merit to require discussion.

On the whole, we find no error in the record prejudicial to the substantial rights of appellant, and, that being true, it is our duty under the law to affirm the judgment.

Judgment affirmed.

Whole court sitting.