## NESTLERODE v. UNITED STATES.
### No. 7790.

United States Court of Appeals for the District of Columbia.

Argued May 5, 6, 1941.

Decided July 14, 1941.

[25] Cf. Scoville v. Toland, 21 Fed.Cas. 863, 864, No. 12,553.

Edward M. Curran, U. S. Atty., Arthur B. Caldwell, Bernard Margolius, and Charles B. Murray, Asst. U. S. Attys., all of Washington, D. C., for appellees.

Before GRONER, C. J., and MILLER and VINSON, Associate Justices.

GRONER, C. J.

In the latter part of June 1940 appellant, Richard S. Nestlerode, left his work place in the city of Washington around noon and drove in his automobile with three companions to Clarendon, a nearby town in Virginia. He next drove to his home in Fairfax, and after a few minutes there returned to the District of Columbia, where in a period of less than half an hour and within a space of 40-odd city blocks he ran his car into a woman and later into a man, both of whom died as the result of the injuries thus sustained. Within a few minutes after he had struck the man he was arrested and subsequently was indicted for both homicides on a single indictment containing two counts, each charging murder in the second degree. He was found guilty by a jury of manslaughter on the first count and of second degree murder on the second, and sentenced to imprisonment in the penitentiary.

The undisputed evidence shows that on his return from Fairfax to the District of Columbia, appellant stopped at his brother's house in northeast Washington for about fifteen minutes. Shortly thereafter he drove through a traffic light at the intersection of 12th and H Streets, NE., striking and fatally injuring Edna Mitchell, who was crossing at that point. Without stopping his car, he drove at a rapid speed to northwest Washington, being pursued a part of the way by a motorist who had witnessed the injury. At 6th and M Streets, NW., he struck an automobile parked at the curb, bounced off, and hit another car in the rear, but continued at a rapid speed through a red light west on M Street to 9th Street. At 9th and M Streets, while driving on the wrong side of the street, he struck Joseph Nappo, so seriously injuring him that he died a few hours later. Still without stopping, appellant continued west on M Street to 14th Street, and drove around the wrong sides of Thomas and Scott Circles to 16th Street, where he again collided with an automobile, notwithstanding which he continued on through traffic lights until he reached the intersection of Connecticut Avenue and Q Street,

Levi H. David and J. Benjamin Simmons, both of Washington, D. C., for appellant.

at which point he ran his automobile into a street car. After the collision, he extricated himself from the wreckage and ran up Connecticut Avenue, where he was overpowered and arrested by a policeman.

On his trial, appellant testified that on arriving at Clarendon with his friends, the latter purchased two pints of apricot brandy and a pint of whiskey and that all hands were drinking on the trip to Fairfax. Appellant claimed to have taken four drinks. The party consumed a pint of whiskey and a pint and part of another pint of brandy. He had eaten nothing since breakfast and felt the effect of what he had drunk. On his return from Fairfax to Washington, he stopped at a gas station in southwest Washington and bought another pint of apricot brandy and drank the most of it while his car was being oiled and greased. He also bought a half pint of whiskey, all of which he drank himself. By this time he was getting "pretty drunk". From this point on, his testimony is that, after he left the filling station, he remembered going up to 11th Street SE., and while waiting for a light a colored man jumped on the running board of his car. The next thing he remembers was when he woke up the following day, wondering why he was in jail. Appellant denied having any recollection of the incidents resulting in his killing of the man and the woman.

Doctor Klein, a psychiatrist of Saint Elizabeths Hospital, was called by appellant to testify as an expert, and in answer to a hypothetical question covering the incidents we have mentioned, testified that in his opinion appellant was at the time of these occurrences temporarily insane. This temporary insanity the doctor described as alcoholic delirium, "or mania from drinking, which sometimes affects individuals until they become disoriented and irresponsible, lacking in judgment, being completely out of control of their mental capacities." The defense below was based on appellant's alleged inability to know or understand the nature of his acts.

Thirteen grounds of error are pressed. They may be grouped under five heads:

1. The correctness of the trial court's refusal to grant the defendant separate trials for the two homicides;

2. The refusal of the court to allow the defendant ten peremptory challenges for each count in the indictment;

3. The sufficiency of the evidence to support a verdict of second degree murder and the correctness of the court's definition of that crime;

4. The sufficiency of the evidence to support a verdict of involuntary manslaughter and the correctness of the court's definition of that crime; and

5. The correctness of the court's instruction on voluntary intoxication and the temporary insanity induced thereby.

First. After arraignment, but before the trial was begun, the defendant moved the court for a severance of the two counts of the indictment and to require the government to elect upon which count the defendant would be first separately tried. This motion was denied by the trial court, and we think the court correctly exercised its discretion. It has long been the law in this jurisdiction, and elsewhere, that a joinder in one indictment in separate counts of different felonies of the same class or grade is permissible, and in offenses against the United States it is expressly sanctioned by statute. R.S. § 1024, 18 U.S.C.A. § 557. Here the record shows that the killings were closely connected in time, place, and continuity. They occurred within a few minutes of each other and on the same automobile ride and by means of the same instrument. See Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208.

Failing to obtain the severance requested, appellant offered Prayer No. 6, which was refused. The effect of that instruction was to tell the jury that in considering the killing which first happened they should exclude from their minds all of the evidence which was pertinent to the second killing only; but the instruction then went on to say that in considering the circumstances of the second killing they should exclude "all evidence tending to prove the commission of the crime alleged in the first count". While the instruction was correct in the forepart, we think it was clearly incorrect in the latter part. The close relation between the killings here makes much of the evidence pertinent to both. But in any event the court's general charge covered the subject adequately.

Second. The argument that the defendant was entitled to ten peremptory challenges for each count of the indictment is without merit. The applicable

statute, D.C.Code 1929, Tit. 6, Sec. 366, authorizes only ten in a prosecution of this nature. If the two counts were properly joined, as we hold they were, it follows that the procedure in relation to the selection of jurors is foreclosed by the terms of the statute. In any event, the question has been decided adversely to appellant in this jurisdiction, and we are not disposed to depart from the established rule. Miller v. United States, 38 App.D.C. 361, 370; Id., 41 App.D.C. 52, 62.

Third. The court instructed the jury that murder in the second degree is the unlawful killing of another where there is not a premeditated design and plan to effect death, but where there is malice aforethought; and the court defined malice aforethought to comprehend an act done regardless of social duty and a mind bent upon mischief—an act of a generally depraved, wicked, and malicious spirit—an act done with a depraved mind and attended with circumstances which indicate a wilful disregard of the rights or the safety of others. We can find no proper ground of criticism of the language in which the instruction is couched, nor with the fact that the court submitted the case to the jury on that charge. The uncontradicted evidence shows that appellant operated his machine from the moment of the first collision to the time of his arrest in total disregard of the lives and safety of others. The wonder of the case is that in this four-mile drive through traffic lights and at a reckless speed over the busiest thoroughfares in the city of Washington, there were not more than two victims. For if ever there was a case which presented every aspect of complete and reckless disregard for the rights of others, this is it. If there are mitigating circumstances, we have failed to find them. Precisely what happened is what might have been expected as the result of the events which appellant set in operation and is the natural and probable consequence of these acts. Malice is presumed under such conditions. Liggins v. United States, 54 App. D.C. 302, 297 F. 881; Sabens v. United States, 40 App.D.C. 440, 443; State v. Trott, 190 N.C. 674, 130 S.E. 627, 42 A.L. R. 1114; Montgomery v. State, 178 Wis. 461, 190 N.W. 105. There is nothing to the contrary in Lee v. United States, 72 App.D.C. 147, 112 F.2d 46. That was a case in which the act which endangered life was itself a felony, and we held that in such circumstances malice existed to support a conviction of second-degree murder. We had no occasion to express any opinion in a case in which the wrongful act was not a penitentiary offense.

Fourth. Objection is made to the instruction on involuntary manslaughter, but we think incorrectly. On this subject, the court told the jury that, if the death of the woman was unintentionally caused by "culpable negligence of a legal duty", they could convict the defendant of involuntary manslaughter. The objection is that this definition substantially describes the statutory crime of negligent homicide, which carries a smaller maximum punishment. It is quite true that negligence on which manslaughter can be predicated must be extreme, and hence it is not unusual to speak of the neglect of legal duty as "gross" or "wanton". But we think that the use of the words "culpable negligence of a legal duty", when considered in connection with the balance of the charge, indicated to the jury that "culpable" was used by the court to mean "wanton" and "gross". Several times in its charge the court mentioned that gross negligence is necessary for a conviction of manslaughter, and the court also specifically instructed the jury that if the defendant's negligence was not "gross", then he could be found guilty only of negligent homicide. Moreover, the objection is now raised for the first time, and there is no exception to the instruction in the record. Since in our opinion the evidence establishes beyond all question both gross and culpable negligence, we do not need to consider this point further. Morris v. United States, 61 App.D.C. 257, 61 F.2d 520.

Fifth. The final ground urged is that the court erred in instructing that drunkenness or temporary insanity caused by the particular debauch should not be held to relieve the defendant from criminal responsibility or reduce the crime from second degree murder to manslaughter. We think this position is not well taken. In the recent case of Bishop v. United States, 71 App.D.C. 132, 135, 107 F.2d 297, 301, we stated the circumstances under which voluntary intoxication will reduce the degree of the offense from murder in the first to murder in the second degree, but we said that the defendant's voluntary intoxication would not of itself negative the malice required to constitute second

degree murder and thereby reduce second degree murder to voluntary manslaughter. This is the correct and generally accepted rule. Here the evidence shows beyond question of doubt that appellant had voluntarily got drunk. His "temporary insanity," as described by the psychiatrist who testified for him, meant no more than that his overindulgence in alcoholic liquors had so affected his judgment and intelligence as to cause him to be utterly reckless in doing acts endangering the lives and safety of pedestrians. But the fact that he was so affected, under the circumstances shown to have occurred here, will not reduce the grade of the offense from second degree murder to manslaughter. Bishop v. United States, supra; Weakley v. State, 168 Ark. 1087, 273 S.W. 374; Johnson v. Commonwealth, 135 Va. 524, 115 S.E. 673, 30 A.L.R. 755; State v. Trapp, 56 Or. 588, 109 P. 1094; State v. Kidwell, 62 W.Va. 466, 59 S.E. 494, 13 L.R.A.,N.S., 1024; Perciful v. Commonwealth, 212 Ky. 673, 279 S.W. 1062; Commonwealth v. Soaris, 275 Mass. 291, 175 N.E. 491, 494. Much less will the appellant be excused from all criminal responsibility. State v. Trott, supra; People v. Townsend, 214 Mich. 267, 183 N.W. 177, 16 A.L.R. 902; People v. Fellows, 122 Cal. 233, 54 P. 830; Folks v. State, 85 Fla. 238, 95 So. 619; Rucker v. State, 119 Ohio St. 189, 162 N.E. 802; State v. Haab, 105 La. 230, 29 So. 725; Peek v. State, 155 Ga. 49, 116 S.E. 629.

The result of appellant's acts was to bring to their deaths a woman and a man. It would be a sad reflection on justice and a menace to society to hold that, because he had chosen to get stupidly drunk, he should escape the punishment of the law.

Affirmed.