## UNITED STATES,

v.

### Lawrence KEARNEY, Appellant.

### No. 81–1043.

United States Court of Appeals, District of Columbia Circuit.

July 20, 1981.

Before MacKINNON, MIKVA and EDWARDS, Circuit Judges.

### ORDER

PER CURIAM.

On consideration of the motion for appointment of counsel referred from the District Court, it is

ORDERED by the Court that the aforesaid motion is granted.

The dissenting opinion of Circuit Judge MacKINNON is attached.

MacKINNON, Circuit Judge (dissenting).

This case personifies the great abuse of repetitive post conviction § 2255 proceedings that clog the courts and raise unjustified hopes in petitioners that a new trial years down the road from their conviction will leave the government with insufficient witnesses and evidence to again obtain a conviction for a most heinous offense.

### I. PRIOR PROCEEDINGS

An indictment charged Lawrence Kearney with committing first degree murder and carrying a dangerous weapon on November 23, 1967. He shot and killed Metropolitan Police Officer Silvia in cold blood. Following a jury verdict of guilty to the lesser included offense of second degree murder and for carrying a dangerous weapon, he was sentenced on September 13, 1968 to concurrent sentences of 15 years to life on the murder and 3 to 10 years on the weapons count.

The conviction was affirmed in *United States v. Kearney*, 420 F.2d 170 (D.C.Cir. 1969) by a panel consisting of Chief Judge Bazelon, Senior Circuit Judge Fahy and Circuit Judge Leventhal. Judge Leventhal wrote the opinion filed on August 15, 1969 which upheld the conviction against appellant's attack on the identification testimony of one Warren.

Kearneys' defense claimed an alibi. The jury disbelieved it. The circuit court held that the failure of the trial court to allow defendant's counsel to cross-examine witness Warren as to whether or not he was on narcotics at the time he gave a statement to the police was not grounds for a reversal or remand where the possibility of mistaken identity of the defendant was strongly negatived by other evidence. It also ruled that the testimony by another witness as to the circumstances of the shooting which had been given to him by the slain officer on the day after he was shot, and the day before he died, was admissible both as a spontaneous utterance and a dying declaration.

Over five years after he was sentenced and four years after the affirmance on appeal, on September 12, 1973 Kearney filed a habeas corpus proceeding claiming (1) newly discovered evidence, (2) "ineffectiveness of counsel", (3) denial of fair trial under due process and equal protection of laws requirements of the 5th, 6th and 14th Amendments and the Bill of Rights, (4) use of prefabricated and manufactured testimony of an alcoholic and drug-addict, and (5) that relevant issues had not been challenged. The petition was bottomed on what was claimed essentially to be newly discovered evidence, principally in the form of an affidavit by one Stanley Warren who was a friend of Kearney's and an eyewit-

ness to the shooting.[1] Warren was 17 at the time of trial and his affidavit five years later stated he had testified falsely at the trial that he was present and saw his friend Kearney shoot Silvia. *Id.* The habeas corpus petition was denied on the ground that a proceeding under 28 U.S.C. § 2255 was required and the government moved that the "petition be treated in the alternative as a motion to vacate under Section 2255."

Thereafter on November 15, 1973 Kearney filed a § 2255 motion (1) alleging ineffective assistance of counsel, (2) that his conviction was based on "prefabricated and manufactured evidence" and "perjured testimony of Stanley Warren." District Court File, 39, p. 2. The principal allegation relied upon was the claim of newly discovered evidence in the form of the affidavit by Stanley Warren that he committed perjury at the trial. *Id.* Kearney's § 2255 petition was considered and denied on February 12, 1974 by the judge who had tried the criminal case. The denial was accompanied by a written order of the trial judge that relied upon the decision by the Court of Appeals and recognized that the claim of possible narcotics use was the alleged underpinning for the perjury claim which in substance was essentially an attack on the *identification testimony* :

"The subject [limited exploration of possible narcotic influence of Stanley Warren at the time of his written statement] relates to the issue of identity, and the possibility of mistaken identity is strongly negatived—if indeed it is not eliminated beyond reasonable doubt—by the sci-

entific evidence, particularly the palm prints, and the credibility of Warren's testimony as buttressed by the account given by Officer Silvia to Detective Crooke. Such strength of the Government's case is highly material in determining whether the interest of justice may be served by affirmance rather than remanded for refinement of trial procedure." *United States v. Kearney*, 136 U.S.App.D.C. 328, 332, 420 F.2d 170, 174 (1969).

District Court File, 40. The trial judge ruled without a hearing that "the motions, pleadings, files and records conclusively show that petitioner is entitled to no relief." *Id.* at 2. Since the affidavit of Warren was before the trial judge and he ruled on the basis of the *"motion"* and the files and records, and not on any procedural defect, he had complete jurisdiction under § 2255 to grant Kearney's motion based on Warren's affidavit, and his order denying such motion is a decree upon the merits. *Mayes v. Pickett*, 537 F.2d 1080, 1082–83 (9th Cir. 1976), *cert. denied*, 431 U.S. 924, 97 S.Ct. 2198, 53 L.Ed.2d 238 (1977); *United States v. Romano*, 516 F.2d 768, 771 (2d Cir.), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975); *Case v. Beauregard*, 101 U.S. 688, 692, 25 L.Ed. 1004 (1879); *Hughes v. United States*, 4 Wall. 232, 237, 18 L.Ed. 303 (1866); *Rogers v. Rogers*, 37 W.Va. 407, 16 S.E. 633, 638 (1892).

*No appeal was taken from this § 2255 ruling.*

---

1.

**AFFIDAVIT**

I, Stanley Warren, hereby state the following under my free will and according to my desire. I have not been threatened in any way nor have I been promised anything for this statement. I make this statement because I want to do so.

I, Stanley Warren, declare that the statement which I gave to the police on Sunday, November 26, 1967 concerning the death of Officer Gilbert Silvia is partially untrue. I was not present at the scene of the shooting and I did not see Larry Kearney shoot Officer Silvia. The original story which I told the police and which is contained in the first part of my statement is true. I changed my story during the police questioning because of the

extreme mental, emotional and physical pressure which was exerted on me for a number of hours on Sunday evening by numerous officers. Earlier, Sunday afternoon, I had taken a shot of heroin and at the time I was so intensely questioned by the police that evening, I was withdrawing from the drug and feeling very ill.

I, Stanley Warren, further state that the testimony which I gave under oath at the trial concerning the witnessing of the shooting of Officer Silvia is also untrue. I testified I saw Larry Kearney shoot Officer Silvia because I was afraid to change the untrue story which I had finally given the police officers that Sunday evening.

Over seven years later, on October 14, 1980, after the trial judge had died, Kearney filed the instant case which is his second proceeding under section 2255. It raises essentially the same claim with respect to Warren's testimony, that was made in 1973 and denied, in contending (1) that his Fifth Amendment due process right was denied allegedly because: "Stanley W. Warren's confession [sic] was coerced and obtained under duress and that it was erroneous and perjured testamony [sic]." It also contends (2) that there was a shifting in the burden of proof in the court's instructions that violated the due process clause of the Fifth Amendment when the court charged: "In determining whether a wrongful act is done with malice, you may infer that a person ordinarily intends the natural and probable consequences of acts performed" (Tr. 974–975, see also Tr. 967). The other contention was (3) that a fair trial as required by the Fifth Amendment was denied in that: "The jury was not properly examined on its qualifications and that several jurors objected to being the tryer [sic] of facts on a case of this nature but were used as jurors anyway." Also, in an aside, Kearney states that none of these issues was brought out at trial and claims support from "[unspecified] newly discovered evidence."

The district court denied this motion by fiat. District Court File, No. 43.

## II. THE TRIAL TESTIMONY

The testimony at trial proved beyond a reasonable doubt that Officer Silvia was shot at about 10:30 or 11:00 p. m. on Thanksgiving Day, November 23, 1967. The only issue was the identity of the killer.

*Positive physical evidence*, in the form of Kearney's palm prints, *combined with other persuasive testimony, indicated that Kearney was the murderer.*

### A. The Palm Prints

His *palm print* was on the steering wheel of the Plymouth car in which he had been

sitting behind the steering wheel immediately before he shot Officer Silvia. This fact is of conclusive significance because the car·belonged to a third person (Callaghan) and Kearney had been observed moments before by Officer Silvia effecting an illegal entry into the locked car by breaking the glass in the door.[2] Since (1) the car was not his, (2) he never had prior access to the inside of the car, and (3) he was observed at the critical time effecting an illegal entry, the physical evidence of his palm prints at two locations on the steering wheel and at one other location inside the car is practically conclusive evidence that Kearney was present at the time and place in question. And there is no evidence disputing the fact that the man who was inside the car emerged to shoot Officer Silvia.

### B. The Blood Stains

In gaining entry into the car when Kearney broke the glass he may have cut himself slightly as some blood stains were found in the glove compartment. Laboratory tests of this blood indicated type A, which matched Kearney's type. This is not conclusive evidence but it proves that Kearney might have been the one who left the blood stains.

### C. The Revolver and the Bullet Slugs

Additional testimony indicated that Kearney did have a .38 caliber revolver on the day of the murder, which was the caliber of the gun that killed Officer Silvia.. A friend of Kearney's testified that on the day of the murder he saw Kearney with a .38 revolver (Tr. 177–78, 830), and that Kearney told him he had obtained the gun on November 20th and that he, the friend, had unsuccessfully tried to buy the gun from Kearney. Additional evidence tying the gun to Kearney and the murder was presented in the form of three slugs from a .38 caliber revolver. One slug was obtained from a door in the house where Kearney lived. Another was obtained from a log that Kearney had fired the .38 into *in the presence of his*

2. The record reflects Kearney had a prior felony conviction for unauthorized use of a motor vehicle.

*friend.*[3] The other slug was fired into the police officer's stomach and caused his death. An additional .38 caliber unfired bullet was obtained from a dresser in Kearney's room. The slugs were too mutilated to determine positively that they were fired from the same gun, but ballistics tests indicated the slugs bore sufficient rifling impressions to indicate *they were all fired from the same type weapon,*[4] a .38 caliber revolver. Also, they were all manufactured by the same company and had a unique copper coating, as did the whole bullet retrieved from Kearney's room.

The defendant could not seriously attack the positive palm print testimony and he *ignored* the completely persuasive testimony of Detective Crooke reciting the dying declaration of Officer Silvia as to the shooting and the circumstances leading up to the shooting. (Tr. 901–940). On appeal the testimony must be considered most strongly in support of the jury's verdict and no different rule applies to a § 2255 proceeding.

### III. THE CLAIM FOR RELIEF

The Federal Rules of Criminal Procedure provide:

> The court on motion of a defendant may grant a new trial ... if required in the interest of justice.... A motion for new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment ....

Fed.R.Crim.P. 33. The present motion brought 12 years after Kearney's conviction, to the extent that it seeks a new trial based on newly discovered evidence, thus clearly exceeds the two-year time limit prescribed by the rule. While the trial court did not rely on the two year limitation when it denied Kearney's motion on February 12, 1974, five years after his sentence became final, the time has come when the time limitation set by the Rule should not be ignored. It is not too much to say that a

motion is not timely that is made 12 years after sentencing to set aside a criminal conviction and grant a new trial upon a claim of newly discovered evidence. *See Oddo v. United States,* 171 F.2d 854, 858 (2d Cir.), *cert. denied,* 337 U.S. 943, 69 S.Ct. 1498, 93 L.Ed. 1747 (1949); *see generally United States v. Robinson,* 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960). *Clark v. United States,* 370 F.Supp. 92, 95 (W.D.Pa.), *aff'd mem.,* 506 F.2d 1050 (3d Cir. 1974), is to the same effect:

> Because more than two years have elapsed since petitioner exhausted the appellate process and his conviction became final, we agree with him that a motion based on newly discovered evidence under Rule 33, Fed.R.Crim.P., is untimely. However, we disagree with petitioner that his petition for coram nobis, which as stated above we treat under § 2255, is an adequate substitute for a timely Rule 33 motion. We have found no case, nor do we believe one exists, which would entitle petitioner to a hearing and determination of the merits of his petition in a collateral proceeding under either § 2255 or a writ of error coram nobis. I would hold that relief could be granted in the interests of justice, but there is no such showing here.

### A. *The Identification Testimony*

Part of Kearney's attack on Warren's testimony is based on a claim that he used narcotics; but even at the time of the trial the defense claimed to have such knowledge, *i. e.:* "Defense counsel: ... We have information that he is a narcotics user." 420 F.2d at 172. The trial court did not preclude examination of the issue. All it did, as this court ruled, was to "defer cross-examination pending establishment of a foundation for the questions." 420 F.2d at 174.

The claim of narcotics use and perjury are interwoven to attack Warren's identification testimony; but there is no allegation

---

**3.** See comment at n.4.

**4.** The testimony that all three slugs were fired from the same type gun, when combined with

the testimony that Kearney was observed to fire the shot into the log from which that slug was extracted, is exceptionally strong evidence identifying Kearney as the assailant.

that the government *knowingly* used perjured testimony. In the absence of such a showing no relief can be granted on that ground. *Elliott v. Beto,* 474 F.2d 856, 857 (5th Cir.), *cert. denied,* 411 U.S. 985, 93 S.Ct. 2284, 36 L.Ed.2d 963 (1973); *Griffin v. United States,* 258 F.2d 411, 412 (D.C.Cir.), *cert. denied,* 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958).

The claim of perjury is a repetition of the claim made in the 1973 § 2255 proceeding. It essentially relies on the old affidavit with no new support. The strength of this claim has not improved with the passage of seven years and should be denied as a successive claim. *Sanders v. United States,* 373 U.S. 1, 9, 83 S.Ct. 1068, 1073, 10 L.Ed.2d 148 (1963).[5] The Federal Rule governing proceedings under 28 U.S.C. § 2255 provides:

> a second or successive motion may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits.

The 1974 denial of Kearney's section 2255 proceeding which was based on Warren's affidavit stating he testified falsely, held "the motions, pleadings, files and records conclusively show that petitioner is entitled to no relief." Such decision was thus on the merits and could have been appealed by petitioner, but he did not do so. The decision thus became final and under the Rule cannot be successfully challenged now, seven years later, unless shown to be "in the interests of justice." Subsequent analysis does not support such a finding. In *Laughlin v. United States,* 474 F.2d 444 (D.C.Cir. 1972), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2784, 37 L.Ed.2d 402 (1973), we held that for any ground of relief presented in a prior § 2255 action, and determined on the merits thereon, re-determination of that ground was dependent upon the judge's exercise of his sound discretion to find that the ends of justice would be served thereby. Accordingly, a reversal of such decision on such grounds must rest only upon a finding of abuse of that discretion. With respect to requiring a hearing we stated: "[N]o hearing is required where the District Court finds that the files and records of the case conclusively determine the issues raised, or that the grounds for relief have been previously determined on the merits and the ends of justice do not require redetermination." 474 F.2d at 452.

In this case the trial court in the first § 2255 proceeding found that the files and

5. Justice Brennan in *Sanders,* remarked:

> A prisoner whose motion under § 2255 is denied will often file another, sometimes many successive motions. We are aware that in consequence the question whether to grant a hearing on a successive motion can be troublesome—particularly when the motion is prepared without the assistance of counsel and contains matter extraneous to the prisoner's case. But the problem is not new, and our decisions under habeas corpus have identified situations where denial without hearing is proper even though a second or successive application states a claim for relief. One such situation is that involved in *Salinger v. Loisel, supra.* There, a first application for habeas corpus had been denied, after hearing, by one District Court, and the denial was affirmed by the Court of Appeals. The prisoner then filed subsequent applications, all identical to the first, in a different District Court. We indicated that the subsequent applications might properly have been denied simply on the basis that the first denial had followed a full hearing on the merits. We there announced a governing principle; while reaffirming the inapplicability of *res judicata* to habeas, we said: "each application is to be disposed of in the exercise of a sound judicial discretion guided and controlled by a consideration of whatever has a rational bearing on the propriety of the discharge sought. *Among the matters which may be considered, and even given controlling weight, are ... a prior refusal to discharge on a like application.*" 265 U.S. [224] at 231 [44 S.Ct. 519 at 521, 68 L.Ed. 989]. The Court quoted approvingly from Mr. Justice Field's opinion in *Ex parte Cuddy, supra,* [40 F. 62] at 66: " 'The action of the court or justice on the second application will naturally be affected to some degree by the character of the court or officer to whom the first application was made, and the fullness of the consideration given to it.' " 265 U.S., at 231–232 [44 S.Ct. at 522]. The petitioner's successive applications were properly denied because he sought to retry a claim previously fully considered and decided against him. Similarly, nothing in § 2255 requires that a sentencing court grant a hearing on a successive motion alleging a ground for relief already fully considered on a prior motion and decided against the prisoner.

records of the case conclusively determined the issues raised. Our opinion in *Thornton v. United States*, 368 F.2d 822 (D.C.Cir. 1966), by Judge Leventhal, states: "the normal and customary method of correcting trial errors, even as to constitutional questions, is by appeal, and [§ 2255] cannot serve as a substitute for the regular judicial process of trial and appeal in the absence of circumstances indicating collateral attack is needed to provide an effective means of preserving constitutional rights." *Id.* at 825–26.

It is also significant there is no claim that Warren was under the influence of narcotics at trial when he testified and identified Kearney. In the absence of a showing of specific facts to indicate serious incompetence of counsel, the relief requested to the extent it may involve a claim on that ground, is not justified. *United States v. Decoster* (Decoster III), 624 F.2d 196, 206 (D.C.Cir.1979) (en banc) (a direct appeal case); *Scott v. United States*, 427 F.2d 609 (D.C.Cir.1970); *Bruce v. United States*, 379 F.2d 113 (D.C.Cir.1967); *Mitchell v. United States*, 259 F.2d 787 (D.C.Cir.); *cert. denied*, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958).

6. Crooke testified to the description of the events as recited to him by Officer Silvia on his death bed, and the testimony was held to be validly admitted as a spontaneous utterance and a dying declaration.

7. The similarity of this testimony, involving the thought process of Officer Silvia, and Warren's confirmation of what was *suspected* by Silvia a block away is extremely persuasive if not conclusive of Warren's presence at the scene of the crime.

Officer Crooke testified that Officer Silvia on his death bed told him:

"He said he continued [from 16th and Corcoran] watching [the man who had broken the window and entered the Chevrolet], and suddenly coming from an easterly direction of this car on Corcoran Street was a second subject. The subject approached the car, and Silvia said the man opened the door and said something to the man who was in the car.

Silvia said at this point *he felt that he was made, that the second man had spotted him.* So he decided to move in. He said he pulled the police car in behind the Chevrolet on an angle into Corcoran Street and got out of the

Finally, the record testimony of Warren, and that of Officer Crooke repeating the detailed dying declaration of Officer Silvia, is identical on so many intricate factual details of the offense, involving timing, movement, location, and even subjective causation for action, that the claim in Warren's affidavit, that he was not present when the murder was committed and did not see Kearney shoot Silvia as he told the police and testified in court, is completely destroyed. Warren and Crooke [6] gave *identical testimony* on the following details:

The time of the murder was between 10:30 and 10:45 p. m. on November 23, 1967 (Tr. 35); Kearney was in a red and white Chevrolet, mostly white when he waved to Warren as he was passing by (Tr. 36); Kearney was seated on the driver's side (Tr. 37) and Warren talked to him through a broken vent window on the passenger side of the car (Tr. 38); the police car was a white Plymouth (Tr. 38), located at 16th and Corcoran on the east side of the street (Tr. 39); [as Officer Silvia suspected], Warren did alert Kearney to the police presence (Silvia) in his car at 16th and Corcoran (Tr. 38–39 cf. 327) [7] the police car left 16th & Corcoran

car and took his flashlight with him and he has his badge." (Tr. 327) [Emphasis added]. Warren corroborated Silvia's suspicion by the following testimony:

Q  Would you tell His Honor and the Jury what you said to Lawrence Kearney when you approached him and talked to him from the broken vent window.

A  I told him that a police car was on the corner.

Q  What word did you use when you said "police car"?

A  Roller.

Q  What do you mean by "roller"?

A  Police car.

Q  When you told Kearney that a roller was there, was any answer made by Kearney after you had told him that?

A  No.

Q  Did you tell him again, did you repeat it again?

A  Yes.

Q  When you saw this police car, were you able to identify it as a police car?

A  Yes.

Q  How were you able to identify it?

A  By a radio aerial on the top of the car.

a few minutes after Warren first observed it (Tr. 41); Warren identified the Chevrolet by its Connecticut tags (Tr. 42); he saw the broken vent in the window on the passenger side (Tr. 43); Officer Silvia (the murdered officer) pulled his car around near the car in which Kearney was seated, got out and asked Kearney, who was behind the wheel of the Chevrolet, for his identification (Tr. 44); Officer Silvia got out of his car and pointed his flashlight at his wallet which he was carrying in his hand. The wallet contained his identification (Tr. 45–46); Officer Silvia then walked around behind the Chevrolet (Tr. 47) and Kearney slid over to the passenger side and got out of the car from that side and stood near the sidewalk (Tr. 48); shortly thereafter Kearney went into his pants, pulled the gun and shot Officer Silvia (Tr. 49); Warren then ran up Corcoran Street [they fled East on Corcoran Street] (Tr. 50, 328); Officer Silvia was wearing a white trench coat which was identified as exhibit 4 (Tr. 51). Compare with Officer Crooke's testimony (Tr. 324–328).

Transcript references are to Warren's testimony at trial. *Cf.* Tr. 953–955 to the same effect.

Warren's statement that Kearney shot Silvia from "three to four feet" away is also corroborated by the testimony of the FBI expert on firearms based on the analysis of the effect of the discharge of the gun on the all-type weather coat then being worn by Silvia. (Tr. 49, 453). The files and record were thus more than adequate five years after the shooting for the trial judge to refuse to credit Warren's belated claim of perjury in the face of the persuasive testimony identifying Kearney as the assailant, *i. e.*: the testimony as to the palm prints, the gun and slugs, the blood tests, the corroborated distance from which Silvia was shot, and the mosaic corroboration of Kearney's and Crooke's testimony of the finest details surrounding the shooting. Having been once denied on the merits by the judge who tried the case there was no necessity seven years later to grant a further hearing or to do other than deny the motion to the extent that it was based on matters previously raised and denied.

**B. *The Instruction on Malice***

The claim that the trial court erroneously shifted the burden of proof to Kearney in violation of his Fifth Amendment due process rights is based on the following malice instruction given to the jury:

> In determining whether a wrongful act is done with malice you may infer that a person ordinarily intends the natural and probable consequences of acts performed. (JA 974–975).

This contention involves the court's recent decision in *United States v. Frady*, 636 F.2d 506 (D.C.Cir.1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). However, *Frady* involved an instruction that was claimed to create a presumption of malice and therefore impermissibly shifted the burden of proof to the defendant and constituted plain error. The malice instruction here is not defective in that particular. The statement "you *may* infer that a person ordinarily intends the natural and probable consequences of acts performed" merely *permits* the inference to be drawn by the jury and does not compel a presumption.

This is even clearer when we note the admonitions that surrounded the single sentence of the instructions that appellant claims was improper:

> Malice may be either express or implied. An expressed malice exists where the unlawful killing of another is in pursuance of a wrongful act or an unlawful purpose without legal excuse. Implied malice is such as *may be inferred from the circumstances* of the killing, as, for example, where the killing is caused by

---

Q  What type of car was this police car?
A  A white Plymouth.
Q  Whereabouts was this police car, the white Plymouth, at the time you told Kearney about it?
A  On the corner of 16th Street.

Q  On which side of 16th Street was it, on the east or the west side? Do you recall, in relation to the car that Kearney was in, the Chevrolet, on which side was it on 16th Street?
A  I guess the east side.

the intentional use of a fatal weapon or a force *without circumstances serving to mitigate or justify the act*, or when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life.

In determining whether a wrongful act is done with malice, you *may infer* that a person ordinarily intends the natural and probable consequences of acts performed.

If a person uses a deadly weapon in killing another, malice *may be inferred* from his use of such weapon, *in the absence [of] any explanation, explanatory facts or mitigation, mitigating circumstances. You are not required to infer malice from the use of such weapon, but you may do so if you deem it appropriate, deem it proper.* (Tr. 974–975). (Emphasis added).

When the charge is read in context, and instructions must be read in their entirety, *see Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *United States v. Haldeman*, 559 F.2d 31, 114 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Martin*, 475 F.2d 943, 947 (D.C.Cir. 1973), it becomes clear that the trial court did not use presumptive language. It was clearly stated that the jury "may infer" malice from circumstances only if there are no mitigating circumstances that negate such inference. The full instruction on malice as given at the trial, thus does not differ materially from the current standard instruction.[8] This instruction conforms to our decisions in *United States v. Wharton*, 433 F.2d 451 (D.C.Cir.1970); and *Green v. United States (Green I)*, 405 F.2d 1368 (D.C. Cir.1968) which was not overruled by *Frady.*

## C. *The Jury Examination*

The allegations that the jury examination was unfair is vague and conclusory and Kearney cannot in this greatly delayed

§ 2255 proceeding raise questions involving the *voir dire* of the jury that could and should have been raised years earlier on direct appeal, or the court finding excuse therefore, in his first collateral attack seven years ago. *Polizzi v. United States*, 550 F.2d 1133, 1136–37 (9th Cir. 1976); *Stirone v. United States*, 341 F.2d 253, 256 (3d Cir.), *cert. denied*, 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965); *Vandergrift v. United States*, 313 F.2d 93 (9th Cir. 1963); *Jeffers v. United States*, 451 F.Supp. 1338, 1343 (N.D.Ind.1978). Jury duty is not a matter of personal choice, but is compulsory on citizens absent justifiable reasons for disqualification. Criminal proceedings are not a card game where one may play a third card if the first two do not win, and then a fourth, etc. Piecemeal litigation is highly objectional. It disrupts the orderly administration of criminal justice and interferes with a speedy trial, which is not outside the due process rights of the government.

Also, while the rule is open to some exceptions, in *Mitchell v. United States*, 259 F.2d 787 (D.C.Cir.), *cert. denied*, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958), we held that "matters open upon appeal cannot be raised collaterally":

Normally, review must come while the matter is fresh, while witnesses, judges and lawyers are available, while memories are accurate.... To permit a convicted person to wait months, or even years as is frequently the case, after the actors have gone and recollections cannot be refreshed, and then to secure review consideration of alleged errors open upon the normal processes of appeal, is to damage, if not destroy, an essential element in the rule of law, the element of accurate impartiality.

259 F.2d at 791.

## D. *Miscellaneous*

At trial the only attacks that could be mustered on the government's evidentiary

---

**8.** "In determining whether a wrongful act is done with malice, you may infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or know-

ingly omitted." *Criminal Jury Instructions for the District of Columbia* (Third Edition, 1978), Instruction 4.21.

case were the two claims, (1) that after Kearney's arrest a doctor did not find a cut on Kearney's hand that might have caused the blood in the glove compartment, and (2) that a young man (Ramsey) 14 years of age who was across the street at the time of the shooting testified that the "killer was taller than Kearney" (Tr. 904). The weakness of this testimony is that a pin prick, or a small glass fragment, could have produced the few spots of blood and left no easily discernible mark on Kearney's skin; and the murderer was wearing a hat which, at the distance Ramsey was standing, could have caused Ramsey to overestimate Kearney's height even if the 14 year old could, from that distance, accurately estimate heights within two and one-half inches.

## IV. CONCLUSION

In sum it is my judgment from the foregoing analysis that there is conclusive physical and persuasive oral testimony, without the testimony of Warren, proving beyond a reasonable doubt that Kearney committed the murder. *None of this conclusive testimony is presently attacked.* Also, Kearney never appealed the 1974 denial of his § 2255 petition which was based on all the files and records in the case and fully supported thereby. See Part II, A, *supra.* Now, seven years after that denial, he attempts to raise essentially the same claims that were previously denied and two other points that are conclusively lacking in legal merit. This attack on a 13 year old conviction, that as a practical matter seeks a new trial, also exceeds Rule 33's two year limitation on motions for new trial on the basis of newly discovered evidence and the delay is sufficiently great that the petition can be denied on that score. For these reasons it would not be in the interest of justice, and would be an imposition on the court, to require it to proceed further. I would thus deny the motion on the ground that the motion, files and record conclusively show beyond a reasonable doubt that Kearney was guilty as convicted and is entitled to no relief. I therefore dissent.