William A. POWELL, Appellant,

v.

UNITED STATES, Appellee.

No. 83–65.

District of Columbia Court of Appeals.

Argued Aug. 1, 1984.

Decided Dec. 13, 1984.

Barbara Bergman, Public Defender Service, with whom James Klein, Public Defender Service, Washington, D.C., was on brief, for appellant.

Helen M. Bollwerk, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Pamela B. Stuart, Asst. U.S. Attys., were on brief, for appellee.

Before PRYOR, Chief Judge, and NEBEKER and ROGERS, Associate Judges.

PER CURIAM:

Appellant was convicted by a jury of second-degree murder while armed, D.C. Code §§ 22–2403, –3202 (1981), and assault with a dangerous weapon, *id.* § 22–502. He seeks reversal of his conviction on grounds of prosecutorial misconduct, instructional error concerning the malice element of second-degree murder and insufficiency of the evidence. Being unpersuaded by these contentions, we affirm.

Early on a Sunday morning in October 1981, a uniformed police officer assigned to a marked cruiser stationed himself at a radar checkpoint along a well-travelled thoroughfare in Southeast Washington. At approximately 10:30 a.m., the officer observed a black Cadillac moving at an extremely high rate of speed. As the automobile approached, the officer checked his radar device, revealing that the vehicle was travelling at eighty-two miles per hour although the posted speed limit was only thirty-five miles per hour. The officer exit-

ed his vehicle and motioned to appellant, who was driving the speeding Cadillac, to pull over. Appellant disregarded the command and sped past, turning to look at the officer as he did so. When the officer realized that appellant did not intend to stop, he ran back to his vehicle, activated the emergency lights and siren, and gave chase. The officer was soon joined in pursuit by a second officer who was also driving a marked police cruiser. Appellant led the two officers on a high-speed chase along a highway, at times driving on the shoulder of the highway and frequently cutting in and out of traffic lanes, causing other drivers to swerve to avoid him. The officers followed appellant as he sped through a tunnel in excess of ninety miles per hour. The officers observed appellant leave the tunnel and turn onto a congested exit ramp which was blocked by vehicles waiting for a traffic light.

The officers slowed their vehicles, assuming appellant would also stop his car. Instead, as they watched, appellant's Cadillac continued up the ramp where Clarence Nicholson's Honda station wagon was stopped momentarily as the drivers in front of him proceeded off the ramp. Mr. Nicholson was seated in the driver's seat and his eleven year old daughter, Melanie, was seated at his side. Suddenly, Mr. Nicholson heard a siren, glanced into his rearview mirror and saw the Cadillac coming at him from out of the tunnel at a high rate of speed. As Mr. Nicholson reached for his daughter, the Cadillac struck the rear of the Honda, spinning it around and knocking the girl to the floor under the dashboard. The impact ruptured the Honda's gasoline tank and the car burst into flames, filling the passenger compartment with smoke.

The officers stopped their cruisers and ran toward the scene of the collision after observing the impact and immediate explosion of the Honda. Upon reaching the Cadillac, they found no one and proceeded to the burning Honda where they were able to pull Mr. Nicholson out of the smoke-filled passenger compartment, noting that his face, hands and clothing were severely burned. Unaware that Melanie Nicholson remained in the Honda, the officers carried Mr. Nicholson a short distance from the burning vehicle and began to administer first aid. Mr. Nicholson soon regained his breath and shouted to the officers that his daughter was still in the car. Both officers returned to the Honda, but were unable to free the child because of the ferocity of the fire.

Several blocks away, two other officers on routine patrol observed smoke billowing from the burning Honda. Their suspicions were soon aroused by the sight of appellant, clothed in street attire, running from the source of the smoke. One of the officers ordered appellant to stop, but he continued to run. The officers gave chase and promptly subdued appellant who immediately said, "Why did I do it? Why didn't I stop? I didn't mean to hurt anybody. It was just a traffic violation." Appellant, although excited, was uninjured and repeated the statements several times. Moments later, the officer who had first observed the speeding Cadillac arrived at the scene where appellant was being detained and identified him as the driver of the Cadillac.

A subsequent investigation of the collision revealed that the Cadillac was travelling at a speed well in excess of the posted limit at the moment of impact. Moreover, it was determined that appellant failed to apply his brakes in any meaningful way although the vehicle's brakes and other mechanical systems were in good working condition at the time of the collision. An autopsy conducted on the day after the accident disclosed that Melanie Nicholson had died as a result of smoke inhalation and burn injuries suffered during the fire.

Appellant first contends that the manner in which the prosecutor presented and argued the government's case against him constituted misconduct necessitating reversal. He asserts that the prosecutor purposefully attempted to appeal to the jurors'

emotions throughout the trial and sought to divert their attention from the question of guilt.

■■■ In evaluating a claim of misconduct by the prosecutor, the reviewing court "must determine whether misconduct occurred and, if so, whether it created 'substantial prejudice' to [appellant]." *Dyson v. United States*, 450 A.2d 432, 437 (D.C. 1982) (citation omitted). This court has repeatedly held that it is improper for the prosecutor to employ inflammatory tactics and devices intended to appeal to the passions and fears of the jurors or to seek a verdict reflecting sympathy for the victim. *See, e.g., Hawthorne v. United States*, 476 A.2d 164, 170-72 (D.C.1984). It is also true, however, that some types of cases, particularly those involving tragic death or injury, have an inherent emotional impact. *See, e.g., Hall v. United States*, 84 U.S. App.D.C. 209, 212, 171 F.2d 347, 350 (1948). Our case law demonstrates that the prosecutor is not required to sanitize the government's evidence. *Green v. United States*, 440 A.2d 1005, 1007 (D.C.1982). It is with these factors in mind that we assess the actions of which appellant complains.

■■■ During voir dire, the prosecutor requested that the veniremen be provided with information concerning Melanie Nicholson's background. Defense counsel objected, asserting that the information was irrelevant and would serve only to apprise the panel of Melanie's good character. The trial court determined that it was proper to provide the panel with background information about the deceased and concluded that as part of the voir dire, it would inform the jurors of Melanie's name, age, address, school and church. Appellant maintains that error attended this determination. We do not agree. The very purpose of voir dire is to permit the defense to be satisfied that prospective jurors are impartial. *Harvin v. United States*, 297 A.2d 774 (D.C.1972). Moreover, one means of assuring the impartiality of the jury is by inquiring whether prospective jurors are acquainted with the witnesses or parties.

*Brown v. United States*, 383 A.2d 1082 (D.C.1978). In the circumstances of the present case, we conclude that it was not improper to describe the decedent briefly, permitting the prospective jurors to determine if they knew, or knew of, Melanie Nicholson.

■■■ Appellant next avers that the prosecutor's opening statement and the manner in which she presented the government's evidence at trial require reversal. During her opening statement the prosecutor described the collision and the events that preceded it as well as the fire and the police officers' efforts to rescue the Nicholsons. It was in this context that many of the sensitive details surrounding Melanie Nicholson's death were first revealed to the jury. Yet the record demonstrates that the emotional impact of this case evolved in large part from the facts, not the manner in which the government's case was presented or argued. The record further reveals that in examining witnesses, the prosecutor dwelt neither upon the gruesome aspects of the young girl's death nor upon the virtues of the decedent. *Compare Reed v. United States*, 403 A.2d 725 (D.C.1979) (prosecutor repeatedly asked questions designed to elicit information concerning the complainant's schooling, awards and talents). While the record discloses that certain of the prosecutor's comments would have better been left unsaid (*i.e.*, referring to the fire as a "funeral fire" and an "inferno"), these comments do not mandate reversal. *See, e.g., United States v. Jones*, 157 U.S.App.D.C. 158, 164, 482 F.2d 747, 753 (1973). Appellant is entitled to a new trial based upon prosecutorial misconduct only if, after balancing the gravity of the misconduct against the weight of the evidence against him, we are unable to say that the conduct did not substantially sway the judgment of the jury. *See Miles v. United States*, 374 A.2d 278, 284 n. 9 (D.C.1977); *Villacres v. United States*, 357 A.2d 423, 428 (D.C.1976); *Medina v. United States*, 315 A.2d 169, 171 (D.C.1974); *see also* D.C.Code § 17-305

(1981). We are confident that in this context, these remarks did not affect the verdict.

■■■ Appellant further maintains that the prosecutor's closing argument was intended to win the jurors' sympathy and prey upon their fears for their own personal safety. Yet when considered in context, it is clear that the prosecutor argued the evidence, not inflammatory generalities. *Compare Clarke v. United States*, 256 A.2d 782 (D.C.1969) (prosecutor deliberately invited jurors to imagine themselves in the victims' situation). However, we observe, and the government concedes, that the prosecutor erred when she stated during closing argument that "[e]very day [Clarence Nicholson] has got to look in the mirror and look at those scars and remember that day." Yet the comment merely stated the obvious to the jurors and constituted "an isolated statement in an otherwise proper summation of the evidence." *Bates v. United States*, 403 A.2d 1159, 1163 (D.C.1979). *See United States v. Monaghan*, 741 F.2d 1434 at 1442 (D.C.Cir. 1984). Moreover, any possible prejudice was effectively eradicated by the court's instruction to the jurors that they were to decide the case "without prejudice, fear or favor, solely from a fair consideration of the evidence." Appellant also asserts that error attended the prosecutor's statement, made during rebuttal, that defense counsel "would like you to find [appellant] guilty of the misdemeanor of negligent homicide." It was clearly not the function of the jurors to concern themselves with the possible punishment appellant faced for the various offenses with which he was charged. *See* Criminal Jury Instructions for the District of Columbia, No. 2.71 (3d ed. 1978); *Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975). However, the remark was the subject of an immediate objection by defense counsel, sustained by the court, and followed by the court's instruction to the jurors to disregard the prosecutor's statement. In its general charge, the court reinforced this admonition by instructing the jury that the arguments of counsel were not evidence and the question of possible punishment was not their concern. Furthermore, when considered in context, the remark may well have been interpreted as an attempt by the prosecutor simply to characterize appellant's defense as an effort to minimize his culpability. In this context, we are satisfied that the remark did not sway the verdict.

Finally, with respect to appellant's claims of misconduct as a whole and the asserted prejudicial effect of these errors, we observe that the government's case against appellant, and particularly its evidence of malice, was extremely strong. As the United States Court of Appeals for the District of Columbia Circuit observed in upholding a second-degree murder conviction against a challenge of insufficiency under similar circumstances,

> [t]he wonder of the case is that in this four-mile drive through traffic lights and at a reckless speed over the busiest thoroughfares in the city of Washington, there were not more than two victims. For if ever there was a case which presented every aspect of complete and reckless disregard for the rights of others, this is it. If there are mitigating circumstances, we have failed to find them. Precisely what happened is what might have been expected as the result of the events which appellant set in operation and is the natural and probable consequence of these acts.

*Nestlerode v. United States*, 74 App.D.C. 276, 279, 122 F.2d 56, 59 (1941). We conclude that the actions of the prosecutor did not substantially sway the judgment of the jury.

Relying upon the standard Criminal Jury Instructions, *supra*, No. 4.23, the court advised the jury that "express malice" may exist "where one unlawfully kills another in pursuance of a wrongful act or unlawful purpose without legal excuse." In addition to other instructions on malice, the court also stated that "implied malice" could be

found where one's behavior is so reckless or wanton that it manifests a disregard of human life.

Appellant reasons that the court's reference to "express malice" impermissibly allowed the jurors to find malice if they simply determined that Melanie Nicholson's death was the proximate result of appellant's speeding to evade the police. Implicit in this contention is the premise that a wrongful act, deemed to be a misdemeanor, which causes a death, must necessarily be governed by the "misdemeanor-manslaughter" rule. *See Walker v. United States*, 403 A.2d 1163, 1165 (D.C.1979). Given our view of the case, we do not reach nor decide that latter question.

▮ In evaluating the propriety of a court's instructions, the reviewing court must look upon the charge as a whole "without selecting and comparing separate phrases for literal content." *Carter v. United States*, 475 A.2d 1118, 1124 (D.C. 1984). Indeed, a jury is asked to treat the court's charge in a similar fashion. In this instance, the jury was given broad definitions of the concept of malice. It was free to apply those concepts on the basis of its own findings of fact. In order to convict, the jury was instructed that it had to conclude beyond a reasonable doubt that appellant was aware of the risk of serious danger to life or serious bodily injury as a consequence of his actions. The plain thrust of the government's case was that the appellant drove his vehicle in a manner which manifested a disregard for the lives and safety of others.

▮ Based on the evidence presented, it was within the jury's province to determine whether they regarded appellant's total behavior as a "wrongful act" causing death or—putting that term aside—simply as behavior which showed a wanton, reckless disregard for life.

▮ When read in full context, we reject the argument that the instructions necessarily caused the jury to view the appellant's flight from the police as a "wrongful act" and that they convicted on that thesis alone. This argument ignores the clear focus of the facts and, in our view, places undue emphasis on one sentence of the instruction.

Appellant's final contention is that the evidence adduced at trial was insufficient to sustain his convictions under the weapons offense statutes. D.C.Code §§ 22–502, –3202(a) (1981). Specifically, he urges, in the instance of a utilitarian object, that unless one is possessed with the specific intent to use an object offensively, it is not a dangerous weapon.

▮ A deadly or dangerous weapon is an object "which is *likely* to produce death or great bodily injury by the use made of it." *Scott v. United States*, 243 A.2d 54, 56 (D.C.1968) (emphasis in original) (citations omitted). Thus, an instrument capable of producing death or serious bodily injury by its manner of use qualifies as a dangerous weapon whether it is used to effect an attack or is handled with reckless disregard for the safety of others. *Parker v. United States*, 123 U.S.App.D.C. 343, 346, 359 F.2d 1009, 1012 (1966). In the context of this case, it was for the jury to determine whether the Cadillac constituted a dangerous weapon. The evidence adduced at trial permitted the jury to conclude beyond a reasonable doubt that the Cadillac, driven at the speeds and in the manner that appellant employed, was likely to produce death or serious bodily injury because of the wanton and reckless manner of its use in disregard of the lives and safety of others. We conclude that the evidence was sufficient to support appellant's convictions.

*Affirmed.*

ROGERS, Associate Judge, dissenting:

The majority opinion holds that the trial court erred in giving the standard instruction on express malice. It nevertheless concludes that viewing the instructions as a whole the jury was not confused. I respectfully disagree. The record indicates

that the instruction, which in effect said express malice exists where a killing occurs in the course of a "wrongful act," and "wrongful act" may be defined as speeding from the police, could not have been ignored by the jury. The jury was twice instructed on this issue, the second time following a second request for reinstruction, which indicates that this issue was troublesome.[1]

The trial court's instruction on "express malice" was inappropriate on the facts of the case. There is no basis for an "express malice" instruction on the facts and even if there were such a basis, the instruction given here was erroneous. The court gave the standard jury instruction on express malice from the "red book"[2] and then added an additional instruction defining wrongful act. The total of the court's instruction was both confusing and, on the facts of this case,[3] an incorrect statement of the law and inappropriately given. Under the instruction the jury only had to find that appellant was speeding from the police and

a death had occurred in order to convict him of second-degree murder. The fact that the instruction was the standard jury instruction is not dispositive. *Carter v. United States,* 141 U.S.App.D.C. 259, 262 n. 11, 437 F.2d 692, 695 n. 11 (1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 655 (1971) (jury's attention may be more clearly focused upon the critical issues for its decision by careful modification of the instructions in light of the particular facts of the case, than by a series of abstract principles unrelated to any factual situation, as could become the case with standardized instructions).[4]

The cases in this jurisdiction do not provide a definition of "express malice" other than reiteration of the standard instruction without explanation.[5] Similarly, I have found no case which describes express malice in the terms used in the "red book" instruction—"unlawfully kills another in pursuance of a wrongful act or unlawful purpose, without legal excuse"—except in quoting the standard instruction itself.[6] Furthermore, federal jury instructions do

1. After the jury retired to deliberate, it returned with a first note requesting reinstruction on manslaughter and involuntary manslaughter. Following reinstructions and further deliberation, a second note from the jury requested reinstruction on murder in the second degree and manslaughter.

2. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.23 (3d ed. 1978) (Murder in Second Degree).

3. The evidence at trial included Police Lieutenant Sevilla's testimony that immediately prior to the impact of appellant's car with the car in which the victim was a passenger, the officer saw appellant swerve his car to the left and then to the right on the ramp and saw the brake lights flash on. Another witness also saw the brake lights of appellant's car go on immediately prior to the impact.

4. Defense counsel requested that the standard instruction on express malice not be given. He argued this was not a case of express malice and the instruction would confuse the jury, and offered an alternative instruction. The court declined to give the alternative instruction, and also denied defense counsel's request that no mention be made of express malice in the jury instruction. The government incorrectly con-

tends that a plain error standard should apply because appellant "acquiesced" in the language of the instruction given by the court, citing *Carter v. United States,* 475 A.2d 1118, 1125 (D.C.1984). In *Carter,* however, the "claim of instructional error" was not raised at trial.

5. *See, e.g., McClurkin v. United States,* 472 A.2d 1348, 1357 (D.C.1984) (malice may be express or implied, express malice exists where one unlawfully kills another in pursuance of a wrongful act or unlawful purpose without legal excuse); *United States v. Kearney,* 212 U.S.App.D.C. 319, 325, 659 F.2d 1203, 1209 (1981) (MacKinnon, J., dissenting) (quoting standard instruction); *Carter v. United States, supra,* 141 U.S.App.D.C. at 262 n. 12, 437 F.2d at 695 n. 12 (quoting standard instruction). In *Carter,* the court noted that malice cannot be equated with conduct involving no more than an intentional act (citing *Green v. United States,* 132 U.S.App.D.C. 98, 405 F.2d 1368 (1968)).

6. The only reference to similar language is found in the context of the history of the felony-murder doctrine.

Coke is probably responsible for the birth of the [felony-murder] doctrine when, in 1644, he said, 'that a death caused by any unlawful act is murder.' He illustrated thus: If a man shoots at a wild fowl and accidental-

not include either this language or the confusing concepts of "express" and "implied" malice.[7] Yet they clearly convey the two basic states of mind which are required for a finding of malice—(1) to have a *specific* intent to kill or to cause serious bodily injury, and (2) to act in a reckless manner with a callous disregard for the life and safety of others. The instant case presents only the second type of malice, since there is no evidence that appellant had a *specific* intent to kill or cause serious injury.

If the terms "express" and "implied" are to be used (despite their lack of precision or definition and the potential for confusion [8]) and the different labels are to indicate different states of mind, as opposed to different methods of proof,[9] then express malice can only apply to acts involving *specific* intent (either intent to kill the decedent, intent to kill another, or intent to cause great bodily harm to the decedent or another). Perkins, *supra*, at 548–49. Various treatises and articles have dispensed with

---

ly kills a man, that is an excusable homicide because the act of shooting is not unlawful; but if a man shoots at a cock or hen belonging to another man and accidentally kills a man, that is murder because the act is unlawful. The doctrine was later limited to cases where the unlawful act amounted to a felony.
2 C. TORCIA, WHARTON'S CRIMINAL LAW § 145 (1979).

Similarly, Perkins' comment that "an intent to do an act under such circumstances that there is obviously a plain and strong likelihood that death or great bodily harm may result" is sufficient to constitute malice, refers to a situation evincing a wanton disregard for the life and safety of others. Perkins, *A Re-examination of Malice Aforethought*, 43 Yale L.J. 537, 566 (1934). Thus, the act does not serve as a predicate for a finding of express malice.

*See also Curry v. United States*, 322 A.2d 268, 270–71 (D.C.1974) (instruction about express malice derived from general instruction on malice).

7. The malice instruction in DEVITT & BLACKMAR, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 41.05 (1977) is:

"Malice aforethought" means an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life; but "malice aforethought" does not necessarily imply any ill will, spite or hatred toward the individual killed.

"Malice," as the term is used here, is but another name for a certain state or condition of a person's mind or heart. Since no one can look into the heart or mind of another, the only means of determining whether or not malice existed at the time of a killing is by inference drawn from the surrounding facts and circumstances, as shown by the evidence in the case.

The comment to this instruction states that language similar to the language in our instruction was deleted. "The statement that ' "malice aforethought" may be manifested by willfully doing any unlawful act,' has been omitted as

unnecessary and possibly prejudicial to a defendant." Comment to § 41.05, at 217.

Similarly, the MANUAL OF MODEL JURY INSTRUCTIONS FOR THE NINTH CIRCUIT, § 8.11A (1984) defines malice as:

To kill with malice aforethought means either:
1. To deliberately and intentionally kill another person, or
2. To act with callous and reckless disregard for human life.

It is not necessary that the defendant hated the person killed, or felt ill will toward him at the time. Use of a weapon or other instrument in a way that causes death is evidence of malice aforethought.

8. One commentator has noted:

The terms "express malice aforethought" and "implied malice aforethought," as they are now used, are the accidental result of a long series of decided cases. They have tended much to confuse the law of felonious homicide. If one single contribution of value has been made by them it remains as yet undiscovered. But they cannot be ignored because of their frequent appearance in the legal literature. The common law felt no particular urge to define them with precision because the punishment were [sic] the same whichever label was applied. Hence the lack of uniformity of definition need occasion no surprise.

Perkins, *supra*, at 548.

9. There is an argument that "implied malice" refers to a situation in which the requisite mental state—for example, callous disregard for life and safety of others—is implied from the circumstances rather than stated "expressly." *See supra*, DEVITT & BLACKMAR INSTRUCTIONS, at ¶ 2. However, this definition is not accurate nor helpful since the actual state of mind can never be "expressly" determined and must always be inferred from the circumstances and the actor's conduct. *See* Perkins, *supra*, at 549–50 ("To avoid this confusion the word 'implied' should be rejected when an inference of fact is intended.").

the labels and instead noted that a homicide is "murder" when one of the various requisite states of mind is present.[10] Of these states of mind, felony-murder is not at issue in this case. Neither is the "resisting arrest" type of murder. *See supra* note 10. That leaves "depraved-heart" murder (WHARTON'S #4) and the various specific intent type murders (WHARTON'S #1, 2 and 3; LaFAVE & SCOTT #1 and 2). Thus, if labels are necessary, the depraved-heart type of murder, such as we have seen in this case, is one in which malice is "implied," and the *specific* intent types of murder are those in which malice is "express."

Therefore, the "express malice" instruction is not an accurate statement of the law and even if it were accurate in some circumstances, it is not on the facts of this case. In defining "wrongful act" as speeding to avoid the police,[11] the trial court blurred any distinction between "implied" and "express" malice. Furthermore, the court's definition of "wrongful act" had the effect of making it easier to convict appellant of second degree murder than manslaughter. *See Green v. United States,* *supra* note 5, 132 U.S.App.D.C. at 100, 405 F.2d at 1368 (where jury could have based its verdict on more than one theory, and one improperly submitted to jury in trial

court's instructions, general verdict not permitted to stand). If any "wrongful act," whether criminal or not, could constitute the basis for a second-degree murder conviction, there would be no need for a misdemeanor/manslaughter rule; any act which is a misdemeanor would be a wrongful act, but acts which are not criminal could also constitute a sufficient basis for a murder conviction.

Finally, the prosecutor misstated the law in opening and closing arguments with respect to the "depraved heart," "wanton disregard for life" type of malice [implied malice]. Defense counsel objected to the prosecutor's opening statement, in which she said at least five times, that the jury could apply a reasonable man test, and moved for a mistrial; the mistrial was denied, the court commenting that the defense would have a chance to argue its own version of malice and then the court would instruct the jury on the law. In closing argument, the prosecutor told the jury:

> [Y]ou are going to hear the Judge instruct you that we charge a person not only with what he actually knows but what a reasonable person in the same circumstances would have taken into account. The reason for that is obvious.

---

**10.** According to WHARTON'S, *supra,* § 137.

The phrase 'malice aforethought' has become a mere symbol denoting various mental states, such as (1) intent to kill; (2) intent to cause great bodily harm; (3) intent to do an act knowing that it will probably cause death or great bodily harm; (4) intent to commit an act imminently dangerous to others and evincing a depraved and malignant heart regardless of human life and fatally bent on mischief; (5) intent to commit a felony; and (6) intent to use force upon a law enforcement officer to avoid arrest or facilitate escape from custody.

Similarly, W. LaFAVE & A. SCOTT, CRIMINAL LAW § 67 (1972) define the "various modern types of murder" which exist today in most jurisdictions and include a fifth which occasionally is considered:

(1) intent-to-kill murder; (2) intent-to-do-serious-bodily-injury murder; (3) felony-murder; (4) depraved-heart murder; (5) resisting lawful arrest murder.

The mental state required in resisting a lawful arrest is not really a separate state of mind since

the circumstances of a specific case will fit within one of the other states of mind.

Though some dicta have indicated that an unintended homicide caused by conduct in resisting a lawful arrest constitutes a separate category of murder, it seems clear that there is no such separate category. To impose murder liability upon one who kills while resisting lawful arrest it is necessary to place him under one of the other recognized categories (intent to kill or do serious bodily injury, depraved heart, felony murder).

LaFAVE & SCOTT, *supra,* § 72.

**11.** The instruction was: "You may find, but you are [sic] required to find that fleeing from the police in an automobile at high speeds in order to arrest—in order to avoid arrest is a wrongful act or unlawful purpose." The trial court omitted the word "not" when it initially instructed the jury at the close of all the evidence. When the court reinstructed the jury after receiving its second note, it did not omit the word "not".

We don't excuse people merely because they close their eyes to it. . . .

The standard is not what a reasonable person would have known in the situation but what this defendant in fact knew. *See United States v. Dixon,* 135 U.S.App.D.C. 401, 404–06, 419 F.2d 288, 291–93 (1969) (Leventhal, J., concurring) (government must prove that defendant was in fact aware of risk involved but nevertheless continued his action); *United States v. Bradford,* 344 A.2d 208, 215 & n. 22 (D.C. 1975) ("In terms of the actor's awareness of risk to life, if he is aware of the risk, the crime is murder and not involuntary manslaughter. If he is not aware, implied malice is not a factor, and he should have been aware, the crime is involuntary manslaughter"). Thus, not only was the express malice instruction incorrect but there was potential confusion with respect to the implied malice instruction.

Accordingly, I would reverse and remand for a new trial.