Vyron WHEELER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 97–CF–1150, 00–CO–994, 01–CO–66, 01–CO–851, 02–CO–931.

District of Columbia Court of Appeals.

Argued Sept. 4, 2003.
Decided Oct. 2, 2003.

Judith A. Lovelace, appointed by the court, for appellant.

James Klein, Samia Fam, and Mercer Givhan, Public Defender Service, were on the brief for appellant in No. 97–CF–1150.

Nicole Lehtman, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese III, Barbara A. Grewe, Teresa Howie, and Mary E. McLaren, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and REID, Associate Judges, and NEWMAN, Senior Judge.

FARRELL, Associate Judge:

Vyron Wheeler was found guilty by a jury of second-degree murder while armed and possession of a prohibited weapon. Although he makes a variety of arguments for reversal, the only one requiring more than summary treatment is his contention that the trial judge erred in not giving his requested instruction on intoxication as a defense to second-degree murder. Rejecting as we do Wheeler's argument that in *Comber v. United States*, 584 A.2d 26 (D.C. 1990) (en banc), this court implicitly overruled prior law holding the defense of intoxication inapplicable to second-degree murder, we affirm.[1]

I.

The shooting death of Earl Rubin took place on the night of January 8, 1996. Viewed in the light most favorable to the government, the evidence established that earlier that evening Rubin and others had been playing cards, drinking, and smoking crack cocaine at an apartment when Wheeler entered, expecting to socialize with the group, most of which he knew. When several members of the group, and ultimately Rubin, asked Wheeler to leave, Wheeler resisted and indicated that he "wanted to fight [Rubin]." Wheeler was persuaded to leave peacefully, but he returned a half hour later with codefendant Boone. Wheeler and Lillian Pitts, his former girlfriend, went into a back room to talk, after which Wheeler came out and spoke with Boone. At some point the two men entered the kitchen, and Wheeler was then seen carrying a butcher knife while Boone was armed with a steak knife. They confronted Rubin, and Wheeler "raised the butcher knife and ... started hollering, 'Man, this is my woman ... I love this woman,'" and "Don't ever step to me [sic] like that." Others tried to "block [Wheeler and Boone] from getting to [Rubin]."

---

1. Wheeler contends separately that the trial judge abused his discretion in not severing his case from that of his codefendant Timothy Boone on the basis of irreconcilable defenses. Under the test of *Tillman v. United States*, 519 A.2d 166, 170–71 (D.C.1986); *see also Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), Wheeler has not shown the prejudice necessary to demonstrate an abuse of discretion. His related argument that Boone, though not testifying, in effect served as "a second prosecutor" against him likewise ignores the strong evidentiary showing of appellant's guilt.

Wheeler further contends that the evidence was insufficient to prove that he committed the murder while armed with "shod feet." As the evidence summarized in the text below will demonstrate, this argument is unavailing. *See generally Powell v. United States*, 485 A.2d 596, 601 (D.C.1984) (manner of use of instrument may determine whether it is capable of inflicting death or serious bodily injury). In any case, since the indictment also alleged— and the evidence amply proved—that Wheeler aided and abetted commission of the murder while armed with a knife, the argument fails under the principles of *Griffin v. United States*, 502 U.S. 46, 56–57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991).

Finally, we reject Wheeler's claims of reversible error resulting from the prosecutor's closing argument (to which no objection was made), as well as the arguments made in Wheeler's *pro se* submission entitled "amicus curiae brief."

Rubin managed to evade the two men and run out of the apartment. Wheeler and Boone ran after him, and an eyewitness in another apartment observed three men (whom she could not identify) running up the street. She saw one of the men—inferentially Rubin—fall, and when the two others caught up to him they began "tussling" with him and telling him to "beg for [his] life." Rubin escaped briefly, but another witness saw the two men overtake him and begin beating and kicking him. Two other eyewitnesses also observed the attack. One saw the taller assailant with a knife in his hand; the other saw the tall man hand the knife to the shorter one and tell him "to kill [Rubin]." Eventually the assailants ran away.

The eyewitnesses approached and saw Rubin lying on the ground in snow, bleeding profusely but still alive. In the snow nearby lay a butcher knife. Rubin later died at the hospital from three stab wounds. Extensive blunt force trauma to his face and head contributed to his death.

Altogether, four witnesses identified Wheeler as one of the men who had chased Rubin out of the apartment. While none of the witnesses who saw the actual beating could identify him by name, their descriptions of the taller assailant closely matched Wheeler's physical features and the clothes he had been wearing that day.

## II.

■ The trial judge instructed the jury on voluntary intoxication as a defense to first-degree murder, but, on the basis of prevailing case law, refused to give the same instruction as to second-degree murder. Appellant concedes the existence of those cases but argues that their validity has been undermined ("eroded") by this court's en banc decision in *Comber v. United States, supra.*[2] We reject that argument.

■ The leading case on intoxication in this jurisdiction is *Bishop v. United States,* 71 App.D.C. 132, 107 F.2d 297 (1939). There the U.S. Court of Appeals reviewed the common law authorities and held that, although voluntary intoxication "may negative the ability of the defendant to form the specific intent to kill, or the deliberation and premeditation necessary to constitute first degree murder, in which event there is a reduction to second degree murder," it "may not reduce murder to voluntary manslaughter, nor permit an acquittal of murder." *Id.* at 136, 107 F.2d at 302 (footnotes omitted). "[V]oluntary immediate drunkenness," in particular, "is not admissible to disprove [the element of] malice" integral to the crime of murder. *Id.* (citation and quotation marks omitted). In keeping with *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), decisions of this court have recognized the binding authority of *Bishop, see Carter v. United States,* 531 A.2d 956, 963 (D.C.1987); *Harris v. United States,* 375 A.2d 505, 508 (D.C.1977), in regard to murder as well as to other crimes requiring proof of malice. *See, e.g., Carter, supra; Washington, supra* note 2, 689 A.2d at 573 (citing *Carter*).

Wheeler argues, nevertheless, that our decision in *Comber* effected a change in

2. Wheeler's request for the instruction rested factually on testimony by Lillian Pitts that a few days after the murder Wheeler told her that he had no memory of the crime, because he was drunk at the time it occurred. The government argues that this testimony falls well short of raising the issue of intoxication, *see Washington v. United States,* 689 A.2d 568, 573–74 (D.C.1997); *Smith v. United States,* 309 A.2d 58, 59 (D.C.1973), and we tend to agree. We do not decide the issue, however, because we consider it important to eliminate the confusion reflected in Wheeler's argument that *Comber* altered this jurisdiction's law with regard to the intoxication defense.

the law by unbundling, as it were, the traditional concept of "malice aforethought" and "making ... clear that second degree murder requires one of three mental states, each of which equates to [the element of] specific intent," hence making intoxication relevant to the crime (Brief for App. at 7). We think Wheeler confuses *Comber*'s endeavor to clarify the meaning of malice with an intent to change existing law. As we explain, *Comber* cannot plausibly be read to have altered the *mens rea* for second-degree murder and thus have opened up the crime to the intoxication defense.

*Comber* did not concern the issue of intoxication, and, for that matter, was not concerned strictly with second-degree murder. It was a consolidated appeal from convictions of two defendants for voluntary manslaughter. "[T]he key element of discussion in th[e] case [was] not [even] whether appellants were improperly convicted of manslaughter, but whether they were convicted of the proper type of manslaughter," voluntary or involuntary. *Comber*, 584 A.2d at 54. Along the way, it is true, the court undertook to review the law of homicides generally in this jurisdiction, starting with the distinction between murder and manslaughter. Finding the traditional category of "malice aforethought" confusing and unhelpful, *id.* at 42 n. 18, the court explained that malice "denotes four types of murder, each accompanied by a distinct mental state":

> First a killing is malicious where the perpetrator acts with the specific intent to kill. Second, a killing is malicious where the perpetrator has specific intent to inflict serious bodily harm. Third, an act may involve such wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought *even if there is not actual intent to kill or injure.* ... [W]e refer[ ] to this kind of malicious killing as "depraved" heart

murder.... Historically, a fourth kind of malice existed when a killing occurred in the course of an intentional commission of a felony. Under this ... rule, malice, an essential element of murder, is implied from the intentional commission of the underlying felony even though the actual killing might be accidental.

*Id.* at 38–39 (internal citations and quotations omitted; emphasis added). The court went on to state:

> Even where an individual kills with one of the four states of mind described above, the killing is not malicious if it is justified, excused, or committed under recognized circumstances of mitigation. Implicit in the notion of malice aforethought is the absence of every sort of justification, excuse or mitigation.... The absence of ... mitigation is thus an essential component of malice, and in turn of second degree murder.

*Id.* at 40–41 (internal citations and quotations omitted).

From the quoted passages, Wheeler argues that *Comber* redefined malice to include only states of mind equating to specific intent. Although he does not clearly lay out his reasoning, it seems that he draws his conclusion from the court's assertion that "[i]mplicit in the notion of malice is the absence of every sort of justification, excuse or mitigation." Presumably, he believes that intoxication falls into the category of "every sort of justification, excuse or mitigation," and because intoxication is a defense to specific intent crimes only, then the malice component of second degree murder, as defined by *Comber*, must require specific intent (see Br. for App. at 15–16).

*Comber* cannot reasonably be understood to have re-defined malice in such a way. First, far from rejecting *Bishop*'s

implicit understanding that malice is not limited to specific intent, the court cited *Bishop* for the proposition that the common law definition of malice aforethought "continues in effect in the District of Columbia." 584 A.2d at 38 n. 9. Moreover, in discussing malice the court drew guidance from *Byrd v. United States*, 500 A.2d 1376 (D.C.1985), *aff'd in part en banc*, 510 A.2d 1035 (D.C.1986), and *Logan v. United States*, 483 A.2d 664 (D.C.1984), neither of which presaged any change in the law of homicide in this jurisdiction. As relevant here, *Byrd* had simply pointed out that, by creating a statutory definition of murder, the District of Columbia codified the common law definition of murder—a definition on which *Comber* based its discussion of second-degree murder. *See Byrd*, 500 A.2d at 1385. *Logan* had held that "specific intent . . . is not a prerequisite to voluntary manslaughter," 483 A.2d at 672 n. 9, a crime which, as *Comber* explained, is a homicide that "but for the presence of legally mitigating circumstances" would be murder. *See* 584 A.2d at 47. It is unlikely, to say the very least, that *Comber* would have sought instruction from *Bishop*; *Byrd*, or *Logan* if it intended, without saying so, to supplant their understanding of malice with something new.

Furthermore, *Comber*'s specification of the third mental state embraced by malice is quite incompatible with an aim to equate malice with specific intent. That state of mind concerns " 'such a wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought even if there is not an actual intent to kill or injure.' " *Id.* at 38–39 (quoting R. PERKINS & R. BOYCE, CRIMINAL LAW 59 (3d ed. 1982)); *see also id.* at 39 n. 11 (quoting 2 W. LAFAVE & A. SCOTT, SUBSTANTIVE CRIMINAL LAW § 7.4, at 199–200 (1986) ("Extremely negligent conduct" creating "an unjustifiable but also a very high degree of risk of death or serious bodily injury to . . . others—though unaccompanied by any intent to kill or do serious bodily injury—" may constitute murder if it causes death)). If murder can be established by proof of "[e]xtreme[ ] negligen[ce]," specific intent plainly is not one of its essential components.[3]

Finally, although Wheeler argues that the trial court was required only to instruct the jury that "legally mitigating circumstances"—here intoxication—could reduce his crime of homicide to voluntary manslaughter, in reality intoxication would operate in this context not as a mitigating factor but as a condition negating the mental state for *both* murder and manslaughter. If Wheeler was intoxicated, his condition "rendered him incapable of forming the . . . intent essential to the commission of the crime charged," *Washington, supra* note 2, 689 A.2d at 573—here, the conscious disregard of an unreasonable human risk necessary to establish second-degree murder. But, as the court explained in *Comber*, "[t]he four mental states recognized as malicious for purposes of second-degree murder exist in manslaughter, as well." *Comber*, 584 A.2d at 52. So a jury finding that intoxication negated Wheeler's ability to form any of the mental states for

---

**3.** *Comber* pointed to *Powell v. United States*, 485 A.2d 596 (D.C.1984), as an example of such "depraved heart" murder. *See* 584 A.2d at 39 n. 13. *Powell* involved a defendant who disregarded a police officer's signal to stop his car and pull over to the side of the road. He led the officer on a high speed chase in excess of ninety miles an hour, turned into a congested exit ramp, and struck the rear of another vehicle, killing one of its occupants. He was convicted of second degree murder because his conduct " 'showed a wanton, reckless disregard for life.' " *Id.* (quoting *Powell*, 485 A.2d at 601). The defendant in *Powell* harbored no specific intent to kill the occupant of the rear-ended vehicle; his objective was to escape confrontation with the police by speeding.

murder logically would reach the same conclusion as to manslaughter. *Comber* could not plausibly have intended its discussion of homicide to have so dramatic an effect on the law of homicide and intoxication, in a case where no issue of intoxication—or, strictly speaking, of murder—was presented.[4]

Because the trial judge correctly refused to instruct on intoxication as a defense to second-degree murder, the judgment of conviction is

*Affirmed.*

---

4. Wheeler argues secondarily that intoxication was relevant here because, on the evidence presented, *only* specific intent—his intent either to kill or to inflict serious bodily harm on Rubin—was realistically at issue. That is bare speculation. The jury was instructed on each pertinent mental state for murder, including conscious disregard of an extreme risk of death or serious bodily injury, and any of those mental states provided a reasonable basis for the jury's verdict.